[Crim. No. 4282. Second Dist., Div. Three. May 25, 1949.]

THE PEOPLE, Respondent, v. HOWARD D. GIBSON, Appellant.

56

Morris Lavine for Appellant.

Fred N. Howser, Attorney General, Frank Richards, Deputy Attorney General, W. E. Simpson, District Attorney, Jere J. Sullivan and Robert Wheeler, Deputy District Attorneys, for Respondent.

WOOD, J.—Defendant was charged with the murder of his wife. In a trial by jury, under his plea of not guilty, he was convicted of murder in the first degree, and the punishment was fixed at life imprisonment. In the trial before the same jury, under his plea of not guilty by reason of insanity, the verdict was that he was sane. He appeals from the "conviction" and from the order denying his motion for a new trial.

Appellant admits that he killed his wife by cutting her throat with a butcher's boning knife. He contends that the trial court erred as follows: (1) In sustaining objections to his proffered testimony to the effect that before and at the time of the homicide certain matters regarding the character and conduct of his wife were preying on his mind. (2) In sustaining an objection to his offer of proof, by way of a hypothetical question to be asked a psychiatrist, that if such matters were preying on his mind he might then commit homicide without being conscious thereof. (3) In refusing to instruct the jury regarding manslaughter. (4) In denying appellant's motion that the trial be continued so that counsel of his choice might represent him.

Mrs. Margaret Gibson, aged 49 years, the wife of appellant, worked as a housekeeper for a Mrs. Hellman in Beverly Hills about four months, and she lived in an apartment which adjoins the back of the garage at the rear of the premises. About 4 feet back of the rear side (north side) of the apartment there is a 6-foot-high brick wall which extends easterly and westerly along the rear of the premises. Beyond the wall there is an alley. At a place in the wall approximately opposite the middle of the rear side of the apartment there is a wood door or gate. A person entering the apartment from the alley would go through the gate in the brick wall, then turn right (west) and go along the rear of the apartment about 9 feet to the northwest corner of the apartment, then turn left (south) and go about 7 feet to the apartment door on the west side of the building. There is a cement walk, about 4 feet wide, extending from the gate to the apartment door. A tree, about 2 feet in diameter, adjoins the outer edge of the 4-foot

cement walk at a place opposite the northwest corner of the apartment. The north side of the tree is about 2 feet from the brick wall. The door of the apartment is about 50 feet from the back porch of Mrs. Hellman's house.

Appellant, aged 49 years, also lived in that apartment for a while, but he had not been living there for a period of four or five weeks preceding the time when the homicide was committed. About three weeks before the homicide Mrs. Gibson had met a Mr. Fricker, aged 78 years, at a dance. In the evening of January 10, 1948, Mrs. Gibson went to a dance with Mr. Fricker. That was the only time they had gone out together. They left the dance about 11:30 p.m. and went in an automobile to a place about one-half block from Mrs. Gibson's apartment, which place was near the entrance to the alley which extended along the brick wall. About midnight they left the automobile there and walked in the alley to the gate in the brick wall. Mrs. Gibson opened the gate and went into the yard. Mr. Fricker remained outside and started to hand to Mrs. Gibson her extra pair of shoes which he had carried as they walked from the automobile. He also tried to kiss Mrs. Gibson, and when he put his head through the gate opening something went over his head, touched his hair, and barely scratched his head. Then he dropped the shoes in the alley and ran about 30 feet. Then as he walked back toward the gate he heard a man inside the wall cursing and saying: "You are a liar. You told me a damn lie. You are no good. You made me believe I [you] was not here any more and then you are still here." "You don't make me believe I [you] don't work here any more." He then heard a woman shout, "Help." Then suddenly it was quiet, he did not hear anything more, and he left.

Shortly after midnight Mrs. Hellman heard a pounding noise, and upon investigating she found Mrs. Gibson lying on the back porch, bleeding profusely, and with a "horrible gash" in her throat. Mrs. Hellman dragged her inside the door and called the police.

The cut in decedent's throat was 4½ inches in length, passed through the thyroid cartilage ("Adam's apple"), and severed the deep blood vessels. There was also a cut, about 2 inches in length, on the upper part of her left arm. There was also a cut, about 1½ inches in length, on her right forearm.

Appellant, a butcher, lived at 1734 South Mansfield Avenue, Los Angeles, during the six weeks preceding January 10, 1948. He testified that he saw his wife on January 1, 1948,

and she told him that she was moving from Mrs. Hellman's place, but she did not tell him where she was going; that thereafter he telephoned to the Hellman residence and someone told him that Mrs. Gibson was not there and had not left a forwarding address; that he wrote two letters to his wife asking therein that she telephone him at the meat market, but she did not telephone him until January 9th; that on January 9th, she telephoned and said that she had received the two letters, that she did not like her new place, and that she was going to quit. He testified further that he had also sent her a registered letter, with a request for a return receipt, to Mrs. Hellman's address; that on Saturday, January 10, 1948, his wife told him by telephone that she had left Mrs. Hellman's place on Janary 1st and had obtained employment in Bel Air, that she could not give him the address because there was no street name, and that she did not know the telephone number; that he asked her in that conversation where he could meet her Sunday morning, and she replied that he should remain in his room Saturday evening and she would telephone him and tell where to meet her; that after he left the market that evening he bought a pint of whiskey and took it to his room; that he drank some of the whiskey, lay on the bed and went to sleep; that he was awakened when the landlady came to collect the rent; that he paid her two weeks' rent in advance, and she asked him if he had seen the letter that she had left in his room; that he then saw the registered letter, which he had sent to his wife, lying on the dresser, and it was marked "Refused"; that he then thought it would be a good idea to go to his former residence, the apartment at the rear of Mrs. Hellman's place; that he probably called a taxicab; that he dressed in his better clothes, intending to spend the night there and go to church the next morning; that he finished the bottle of whiskey which he had brought to his room, and when he started to open another bottle of whiskey he could not find his nail file which he customarily used to open bottles; that he then took the knife (the one used in the homicide) from a dresser drawer and started to open the bottle with it, and at that time he heard an automobile horn; that he went out to hail the taxicab and ask the driver to wait for him; that he had intended to return to his room before starting on the trip, but the apartment house door closed and locked when he went outside and he did not have his key; that at that time he did not recall "having the knife in my possession"; that he did

not know when he put the knife in his pocket; that he got out of the taxicab at the Pacific Electric station in Beverly Hills and went into a cafe and ordered a drink of whiskey; that he walked from there to his former residence at the rear of Mrs. Hellman's place; that as he approached the place he was a little cautious because he was not sure that his wife was there; that all the blinds in the house were down and the lights in the house were on; that he looked through a crack and saw that some of his wife's things were in the house, and he believed that she was still there; that he knocked on the door but there was no response; that he became worried about his wife because she "never went out at nights that way" in the last year and a half, and because all the windows were closed and there was "only open gas heat in the house, and it was dangerous"; that as he was reaching in his side coat pocket to get a cigaret he "encountered this knife," which was wrapped; that he removed the knife from his pocket, unwrapped it and threw the paper over the brick wall; that he then cut the screen of the bathroom window with the knife; that he used the knife in trying to push the window open but it did not open, and "the knife bent back"; that he "was getting to feel woozy or wobbly," and being unsteady he leaned against the brick wall and the tree, and he stood "there with my back against the tree, and the wall, kind of wedged in between there so that I could look out the driveway and see my wife when she did arrive"; that while he was in that position he "fell asleep or passed out intoxicated"; that when he awoke he saw his wife, with her back and left side toward him, just extending her arms around a man's neck and turning her head sideways, and in turning her head sideways in front of his head she cut off the man's view of appellant; that the man was prevented, by his head, from seeing appellant, "but he [the man], at that time, or prior to that time, when, I don't know—but he had his hands on her buttocks, apparently pulling her toward him," and there "were no shoes in his hands at that time"; that when "I seen him in this position—arms reached, I believe, from him, a step or two removed from him, it seemed as though my best description of it, it was like a toy balloon that was blown up—becoming beyond bounds or out of proportion, only it was like a light, a light bursting, or a light bulb expanding. Everything was a white light. I do remember lunging and striking out at her"; that "That is the last knowledge, the bursting of light, an extreme light or a white light, as you

might describe it, that I had any knowledge of it until being in a taxicab on my way home to my residence," and "the next memory I had [after that] was I spoke to the two arresting officers."

A bartender at a place near the Pacific Electric station in Beverly Hills, testified that appellant, who was an occasional patron there, came to the bar very late at night January 10, 1948, remained there about two minutes, and had one drink of whiskey; that appellant said, "You won't be seeing me around any more"; that the witness asked why he would not be around any more, and he replied that "You will hear; you will be hearing pretty soon."

A taxicab driver testified that appellant entered his taxicab at 12:25 a.m. on January 11, 1948, at the taxicab stand near the Pacific Electric station in Beverly Hills and gave him an address on South Mansfield Avenue as the place where he wanted to go; that after the driver had taken him to that address the appellant said that the driver "would remember that trip for a long time"; that the driver asked him what he meant by that statement and "He told me I would know later."

Mr. Pavlock, who roomed at the same house on South Mansfield Avenue where appellant roomed, testified that he had worked as a butcher in the same shop with appellant; that about 1:10 a.m. on January 11, 1948, the appellant rapped at the side door of the house and asked him to open the door and stated that he had forgotten his key; that he (witness) opened the door and let appellant in, and before appellant entered his room he asked if the witness would do him a favor "tomorrow" and stated, "I am going to write a letter and I want you to mail it for me"; that the witness agreed to mail it; that within a few minutes thereafter he heard appellant talking on the telephone which was in the hall; that he heard appellant say: "I am sorry, Champ. You have been a swell fellow, a nice man to work for. Will you please send my money to . . . an address in Kentucky"; that he heard him saying at that time that he had done something to Margaret; that the witness surmised that something was wrong, and after having talked to his wife and the landlady, he went into appellant's room and asked him what had happened that night and whether there was anything the witness could do to help him; that appellant said, "Oh, everything is all right"; that the witness said, "Come on. Tell me what happened," and that

appellant replied, "Well, I will tell you. I killed my wife"; that the witness said, "I can't believe it. It isn't like you to do anything like that"; that appellant said, "Well, I did. I will show you"; that appellant then got the butcher's boning knife (the one used in the homicide) and showed it to the witness; that the blade of the knife was bent, the tip of it was curled, and there were brown stains on it; that appellant then said, "If you don't believe me up to now, I will show you the blood on my clothes"; that he then brought a gray suit and a topcoat from his closet and showed them to the witness; that there was "a brown stain on the right breast side and on the tip of the right sleeve"; that he told the witness that he stuck her eight or nine times and then he slit her throat, that he was waiting for her to show up that evening, that he propped himself against a tree and waited until they came home; that, in answer to the witness' question as to why he did that, he said that he was all broken up "about her and him not being together"; that appellant said that he was glad it was all over now, that he would be able to get a night's rest, that he was not running away, and that "they" would be after him that night or the next morning; that the officers arrived about five minutes after he left appellant's room. He testified further that the letter which appellant asked him to mail was given by appellant to Mrs. Pavlock and she gave it to the witness; that the letter was unsealed and he (witness) read it and gave it to the officers; that he knew appellant's handwriting and that the letter was written by appellant.

The letter just referred to is as follows: "Lona & Kiddies Please Forgive & forget me this had to come—no one knows how I have suffered. it is the gas chamber for me but better that than living as I have been. Best wishes to all. Howard." The letter, which was in an airmail envelope and had airmail postage on it, was addressed as follows: "Lona R. Gibson 139 Ashland Dr. Latonia Ky."

Mrs. Pavlock testified that a short time after Mr. Pavlock had let the appellant in the house the appellant came to their room and handed a letter to her and asked that her husband mail it the next morning.

Champ Reese testified that appellant worked for him in one of his meat markets; that on January 11, 1948, about 1:15 a. m. appellant telephoned him and said, "I think you had better get another man to open up your market Monday morning"; that Mr. Reese said, "Well, what is the matter, Howard; what is your trouble?"; that appellant said, "Well,

I have had some more family trouble. I would like for you to send my check back" to Latonia, Kentucky, to his (appellant's) son; that he told appellant to call him the next morning and meet him at one of the stores and he would be glad to see if he could help him; that appellant said, "No, I can't"; that the witness then said that unless he could help the appellant he did not appreciate his telephoning at that time in the morning, and "What is your trouble?"; that appellant said, "I just killed my wife."

The taxicab driver, who took appellant to the Pacific Electric station in Beverly Hills, testified that he saw appellant at the Mansfield Avenue address about 10:40 p. m. on January 10th; that when he (driver) arrived at the Mansfield address appellant was waiting in the yard; that he (driver) did not blow the taxicab horn.

Officer Beattie arrived at the scene of the homicide about 12:35 a. m. on January 11th and at that time the deceased was being taken from the back porch of Mrs. Hellman's house to the ambulance. When he arrived there the door of Mrs. Gibson's apartment was open, there were many blood stains on the walk at the entrance to the apartment, on the apartment door, and in the front room and bathroom. There was a large pool of blood on the floor of the stall shower and there were many blood stains on the wall of the shower. The wash basin and lavatory were covered with blood stains. A coat and a pair of glasses were on a chair, and there were several slashes in the coat and there were blood stains on the glasses. There were blood stains on the rear steps and rear door of Mrs. Hellman's house. Mrs. Gibson's shoes were in the alley just outside the rear gate.

Officers Beattie and Alcorn arrived at appellant's room on Mansfield Avenue about 1:45 a. m. Officer Alcorn testified that when they entered appellant's room he (appellant) said, "I know why you are here"; that in response to questions by the officers as to why he thought they were there, appellant replied, "Because I killed my wife"; that in response to their question as to what he used to kill her, he replied, "A knife"; that in response to a question as to where the knife was, he pointed to a table; that the officer took a "sharp six-inch knife" from the table, showed it to the appellant, and asked him if it was the knife with which he slashed his wife; that appellant replied that it was the knife; that he asked appellant how he had used the knife upon his wife,

and appellant stated that he had slashed her seven or eight times and then cut her throat; that in response to a question as to why the knife became bent he replied that it must have happened when he struck her with the knife; that he (officer) went to Mrs. Pavlock's room and obtained a letter from her (the letter above quoted addressed to Lona R. Gibson); that they then took appellant to the police station in Beverly Hills.

While appellant was in jail (the following Monday) he wrote a letter to his son James Gibson, 139 Ashland Drive, Latonia, Kentucky, and handed it to the jailer for mailing. That letter is as follows:

"Monday. A M.

Dear Jim:

I am addressing this to you, but it is for the entire family.

I am in one terrible predicament, one that has but one ending. I am somewhat ashamed, and forgive me for the shame and suffering this will cause. try to find solace in God, as that is what I am going to have to do.

I can't exactly explain how it all happened, but I killed Margaret, Sat. night or Sunday morning. went insane I suppose.

My attorney a Mr Westermore will keep in touch with you, and send my personal belonings to you.

There is nothing any of you can do but pray for me, please don't come as that would only hurt all of us.

Love to all<br>Dad.

"you can keep in touch with me through my attorney"

Officer Alcorn testified further that immediately after taking appellant to the police station they took him to the police chief's office and there the officers had a conversation with appellant regarding the homicide, and that his statements were free and voluntary. Officer Alcorn testified that in said conversation the appellant made statements, in addition to those included in appellant's testimony, as follows: That appellant said that about 10 p. m. on January 10th, with the thought still on his mind that his wife had lied to him about her place of residence, he went to a dresser drawer and removed from it a knife which was wrapped in butcher paper and a magazine; that he placed the knife in his overcoat pocket, left the room, called for and met a cab in front of his house; that he went to a large tree which was about 10 feet from the

door of his wife's apartment, removed the knife from his overcoat pocket, took the paper from the knife, threw the paper over the fence, and stuck the knife in the tree; that he waited there about two hours until his wife and an unknown person arrived at the back gate; that he saw the gate open, saw his wife enter, and he "believed this other person to be a man who was standing there," and "with this," he said he "blew his top," ran over to the gate, and with the knife in his right hand slashed at his wife seven or eight times, and berated her for being untrue to him; that his wife forced her way past him, went to the apartment door, took her key from her purse, unlocked the door, and entered the apartment; that she went across the living room to the bathroom, and he followed her into the bathroom; that she then walked into the shower room, and he followed her into that room and "with the knife still in his right hand, and with one sweep, cut her throat"; that before he cut her throat she was merely standing in the corner of the shower; that he believed that "with his left hand he grabbed his wife's head by the hair and held it back while he slit her throat"; that he had been married to her about four years; that shortly after their marriage he had reasons to believe that she had been unfaithful to him, and he had had an act of this type in mind for some time.

After that conversation, about 2 a. m., Officers Alcorn, Beattie, White and Chief Anderson, took the appellant to the scene of the homicide. Officer Alcorn testified that appellant showed them the tree by which he stood, the gate through which his wife came, where she was when he first slashed her, the route she took into the house, into the bathroom, into the shower room, and where he slashed her throat. He testified further that the pointing out of those places by appellant corresponded with the conversation they had had with him, and that appellant indicated to them that he had stood behind and on both sides of the tree. He testified further that on January 14th he and Officer White found, in the alley and directly over the wall from the tree, some meat paper and a meat market magazine which were wrapped in a "sharp V-shape" and with "sticky tape" at the bottom and a rubber band at the top; that they showed the paper to appellant and he said that it was the paper in which he had wrapped the knife before placing it in his overcoat pocket. On cross-

examination, Officer Alcorn testified that appellant said as follows: He was emotionally upset. He loved his wife. She had sold a house in Louisiana without his knowledge. She had taunted him regarding her conduct with other men. He believed that his wife had been involved in prostitution in Akron and had been arrested there. She said she had been a prostitute before her marriage to him.

Appellant contends, as above stated, that the court erred in sustaining objections to testimony offered by him to the effect that before and at the time of the homicide certain things were preying on his mind. In response to a question by his attorney he testified that something was preying on his mind prior to the incident involved here. He testified that due to his wife's past conduct he was worrying a great deal because on various occasions she had been unfaithful to him. His attorney asked him if one of the things that was preying on his mind was the fact that his wife had deceived him as to the number of times she had been married. An objection to the question on the ground that it was leading was sustained. His attorney then asked if one of the things that was preying on his mind was the fact that his wife had sold a house and absconded with the proceeds of the sale. An objection to the question on the ground that it was leading was sustained. After extended discussion by the judge and attorneys regarding the admissibility of such evidence, assuming that it could be elicited other than by leading questions, the judge indicated that such evidence was not admissible. Then appellant's attorney offered to prove that at the time of the homicide various things were preying on appellant's mind, which things were as follows: that shortly after their marriage he learned that his wife had been a prostitute; that she had absconded with his funds and left him penniless in Louisiana, just prior to the time they were to occupy a new house purchased by him; that she taunted him upon frequent occasions regarding sexual relations she had had with other men; that he had loved her and had always forgiven her transgressions; that he had made her the recipient of many gifts and she was ungrateful and unfaithful; that she had deceived him as to the number of times she had been married and had stated that she had been married twice whereas in fact she had been married seven times; that about midnight on January 10th he observed her in the arms of another man. Then appellant offered to present testimony of a psychiatrist, by way of a hypothetical question based upon the assumption that if said

things above mentioned were preying upon the mind of a man, the man might commit homicide without being conscious thereof. The court rejected the offer of proof regarding the things that were preying on appellant's mind, and rejected the offer of the testimony of the psychiatrist. The deputy district attorney argued to the effect, in support of those rulings of the court, that such offers related to the issue of insanity under appellant's plea of not guilty by reason of insanity and that such evidence was not admissible at the first stage of the trial under the plea of not guilty. Those rulings of the court were erroneous. (See *People* v. *Wells*, 33 Cal.2d 330, 344, 345, 350, 351 [202 P.2d 53].) In the cited case the court held (p. 344) that at the first stage of the trial, under the plea of not guilty, the trial court properly allowed the defendant to give testimony as to his state of mind which tended to show lack of malice aforethought. The defendant therein was not allowed to introduce proffered evidence of physicians, who had observed the defendant, to the effect that he was suffering from an abnormal mental condition (not insanity). In that case defendant made an offer of proof to the effect that two days before the alleged assault he was examined by a psychiatrist who concluded that the defendant therein was suffering from a "state of tension," that is, a condition in which the body and mind are in a state of high sensitivity to external stimuli. That offer of proof was refused by the trial court. The court therein said, at page 345: "Under the circumstances the materiality of this evidence in defendant's case is patent. . . . In resolving this question in a close case the jury could well be materially aided by the knowledge that, in the opinion of qualified experts, the defendant's condition was such that he might readily have acted from genuine fear rather than from a desire for vengeance or from any other malicious purpose." It was also said therein at page 351: "Evidence which tends to show legal insanity (likewise, sanity) is not admissible at the first stage of the trial because it is not pertinent to any issue then being litigated; but competent evidence, other than proof of sanity or insanity, which tends to show that a (then presumed) legally sane defendant either did or did not in fact possess the required specific intent or motive is admissible." ▮ The erroneous rulings of the court herein rejecting said offers of proof, however, were not prejudicial. The evidence was offered in support of appellant's asserted defense that he committed the act charged without being conscious thereof. Section 26

of the Penal Code provides in part as follows: "All persons are capable of committing crimes except those belonging to the following classes: . . . Five. Persons who committed the act charged without being conscious thereof." According to appellant's own testimony he carried the butcher's boning knife in his overcoat pocket from the place where he was rooming to the home of his wife; that when he found that she was not at home he removed the knife from his pocket, unwrapped it and threw the wrapping paper over the brick wall; that he then stood in a narrow place between the tree and the brick wall so that he could see his wife when she arrived home. Although he testified that "the bursting of light" was the last knowledge he had until he was "in a taxicab on my way home," he also testified that he did "remember lunging and striking out at her." The fact that he knew he lunged and struck at her establishes that he was not unconscious for a while at least after the alleged "bursting of light." In view of that testimony of appellant showing that he was conscious of making the assault, the proffered testimony of the psychiatrist, to the effect that in his opinion there might be circumstances in which a man might commit an assault and might not be conscious thereof, would be practically valueless. It is also to be noted that appellant testified in fine detail as to what he saw when his wife and the man arrived at the place where he was waiting—he saw her back and left side toward appellant, she was "just extending" her arms around a man's neck, she was "turning" her head sideways, her head was in front of the man's head, the man could not see him, and there were no shoes in the man's hands. The period of time from the alleged "bursting of light" to the time he arrived at his home was approximately an hour. Since he testified that he regained consciousness while in a taxicab on the way home, it appears that the period of alleged unconsciousness was less than an hour. A bartender testified that appellant was in the bar late at night and told him that he would not be seeing appellant around there any more—that he (bartender) would be hearing the reason "pretty soon." That incident, indicating consciousness, was before he entered the taxicab to return home. Also he gave the taxicab driver his correct address. Almost immediately after he arrived home he wrote a letter to his relatives stating, in part, "Forgive & forget me this had to come" and "it is the gas chamber for me." In view of the fact that at the time he wrote that letter no one had informed him that he had killed his wife, the

statements in the letter that "this had to come" and "it is the gas chamber for me" are wholly contradictory of the theory or assertion that he was not conscious at the time he killed her. The testimony of appellant that he was at the gate when he lunged and struck at her and the fact that blood was outside and inside the apartment and a large pool of blood was in the shower stall indicates that appellant pursued her from the gate to the shower. In order to accept appellant's theory that he became unconscious when his wife was at the gate, a trier of fact would be required to draw the unreasonable conclusion that while he was unconscious he cut her with the knife when she was at the gate and then, while he was still unconscious, pursued her to the shower and there inflicted the fatal cut.

In the case of *People v. Danielly*, 33 Cal.2d 362 [202 P.2d 18], the defendant was convicted of murder in the first degree. He was not living with his wife. About 12:30 a.m. on October 13th he shot and killed his wife as she sat in an automobile in front of her home. Just prior to the homicide, his wife and another woman and two men went from her home to the automobile. As they approached the automobile, the defendant left his automobile, which was parked across the street from his wife's house, and went, with a pistol in his hand, to the other automobile where he killed his wife. The defendant's alleged defense was that he was at his home in bed from 6 p.m. on October 12th until the police awakened him about 1:30 a.m. on October 13th, and that he had no memory of, and never was conscious of, anything during some six to eight hours immediately preceding the arrival of the police at his home. In that case the defendant sought to show by lay and expert testimony that he was "highly unstable, highly emotional," and suffered from "nervous disability." Objections to that testimony were sustained by the trial court, and those rulings were upheld on appeal. The court therein said, at page 378: "There is a complete absence of evidence of any objective situation, occurring at or near the time in question, which would furnish any cause, reasonable or otherwise, for defendant, devoid of malice, to react in a 'highly emotional, highly unstable' manner and on that account leave his bed, take a loaded gun and go to his wife's residence." The court also said therein (p. 369): "It is to be noted that the fine detailing of events . . . beginning when the police 'came barging in' to his [defendant's] room . . . is the testimony of the defendant who, it is now urged, has absolutely no

memory of, and never was conscious of, any events or acts during some six to eight hours immediately preceding such 'barging in' of the police.''

As above noted, appellant herein testified in fine detail as to happenings immediately preceding the alleged "bursting of light." It appears from all the evidence herein, and particularly from the circumstances hereinabove specially referred to which refute appellant's theory of unconsciousness, that the issue in the present case as to appellant's state of mind was not a close one, and that the exclusion of the psychiatrist's opinion testimony was not prejudicial. (See, *People* v. *Wells*, *supra*, 33 Cal.2d 330, 357.) In the present case, as stated in the case just cited at page 358, it does not appear that there is "any reason for the jury's having been in doubt or difficulty in resolving against defendant the question of his state of mind."

"An act committed by a person while in a state of voluntary intoxication is nonetheless criminal by reason of his having been in such condition." (*People* v. *Anderson*, 87 Cal.App.2d 857, 860 [197 P.2d 839].)

■ Appellant's further contention that the court erred in not giving an instruction regarding manslaughter is not sustained. He testified that the "bursting of light" was the last knowledge he had until he was in a taxicab on his way home. If he committed the act charged while he was unconscious he was not guilty of manslaughter or any crime. (Pen. Code, § 26, subd. 5; *People* v. *Danielly*, 33 Cal.2d 362, 376 [202 P.2d 18].) The court, at appellant's request, gave three instructions to the effect that if appellant was not conscious of his acts at the time he killed his wife the jury should find him not guilty. The jury did not believe his testimony to the effect that he was unconscious. It found either that the killing of his wife was the result of his willful, deliberate and premeditated intent to kill her, and that the killing was accomplished by his lying in wait, or it found that the killing was the result of his willful, deliberate and premeditated intent to kill her, without finding as to lying in wait. In either event it was murder in the first degree. When the killing is perpetrated by lying in wait it is murder in the first degree. (*People* v. *Tuthill*, 31 Cal.2d 92, 99-101 [187 P.2d 16].) Even if appellant fell asleep while he was lying in wait, that fact did not exclude lying in wait as a "means" through which he accomplished the killing. (*People* v. *Tuthill*, *supra*, p. 101.) The preparation for carrying the long sharp knife, the carry-

ing of it in his overcoat pocket from his room to his wife's home, the removal and disposal of its wrapping or "sheath" after arriving there and sticking the knife in the tree, and standing in the obscure but advantageous position between, and against, the tree and wall while he was waiting at midnight for her arrival (which position was a few feet from the rear gate and the apartment door, and from which position he could see the rear gate and the front driveway), are strong evidences that he had formed a specific intent to kill her and that he was lying in wait. In *People* v. *Danielly, supra,* 33 Cal.2d 362, the facts are similar to the facts herein. In that case, wherein the charge was murder, the defendant left his bed in the nighttime, took a loaded gun and went to his wife's residence and killed her when he saw her leaving her home about midnight with another woman and two men; and he asserted as an alleged defense that he was unconscious and had no memory of his acts. The court therein said at page 378: "The evidence in its material aspects, therefore, may be said to show either that the defendant is guilty as charged or wholly not guilty because he acted while unconscious." Also in that case, in discussing defendant's contentions that the offense was at most manslaughter and that the trial court had erred in refusing to admit certain evidence which defendant asserted would tend to show that he acted in a "heat of passion," the court said at page 371: "There is no evidence whatsoever that the killing resulted from a sudden quarrel and in the heat of any reasonably aroused passion." In the present case the court did not err in not giving an instruction regarding manslaughter.

Appellant also contends that the court erred in denying his motion for a continuance. The information was filed on January 29, 1948. On February 2, 1948, appellant appeared, with his counsel Mr. Morris Lavine, for arraignment, and upon appellant's request the matter was continued to February 13, 1948. On February 13th, the matter of arraignment was continued to February 20th, and then it was continued to February 26th. On February 26th, appellant entered his pleas and the trial was set for April 27, 1948. On April 27th, Mr. Safier, an attorney, appeared in court with appellant and stated that Mr. Lavine, counsel for appellant, was engaged in another trial, and he asked for a continuance in the case to May 18th. The trial judge said if the case is to be continued "it will have to be Monday, June 7th." The case was then continued to June 7, 1948. On said last mentioned day, at

10 a.m., Mr. Ralph R. Rubin, an attorney employed by Mr. Lavine, appeared in court with appellant and made a motion for a continuance on the ground that Mr. Lavine was engaged in a trial. He also said that Mr. Lavine had not anticipated that the case he was trying would require as much time as it had required, that it was then about concluded, and that the arguments were then being presented to the jury; and that on ''June 15th, Mr. Lavine must start a trial in the case of *United States* v. *Kawakita*,'' in which case witnesses had come from Japan, and that the case would ''last from four to six weeks.'' The court referred to the continuances that had been had, and stated that on April 27th the witnesses were present and the plaintiff was ready for trial and the case was continued for the same reason that a continuance was then being asked. The court also stated that the only continuance that could be granted would be a continuance for two months or longer. Mr. Rubin stated ''that there would probably be a disposition in the case.'' The motion for continuance was denied. Mr. Rubin stated that he was not prepared to defend the appellant, and the appellant said that he was not prepared to go to trial without Mr. Lavine's presence. A recess until 11 o'clock was then taken, and after the recess the court appointed Mr. Rubin to defend appellant. Mr. Rubin stated that he was not prepared to try the case. An adjournment was then taken until the next day, June 8th, at 10 a.m.

At said time on June 8th, Mr. Rubin filed affidavits of himself, the appellant, and Mr. Frankenberger, in support of a motion for a continuance. Mr. Rubin's affidavit stated that he was admitted to the bar in June, 1947; that he had tried two misdemeanor cases and two civil cases but he had not tried a felony case; that by reason of his inexperience he was not ready to try the case; that he requested a continuance to enable Mr. Lavine to be present, and that he objected to being substituted in the place of counsel of defendant's choice. Appellant's affidavit stated that he had employed Mr. Lavine as his counsel; that the court had appointed Mr. Rubin, over appellant's objection, to act as attorney for appellant. Mr. Frankenberger's affidavit stated that since May 17, 1948, Mr. Lavine had been continuously engaged in the trial of a felony case in Department 37 of the Superior Court. The trial judge read the affidavits, and denied the motion, and told Mr. Rubin that if he was not in a position to proceed that morning with the examination of jurors the matter would be continued until 2 p.m. The judge also told appellant that appellant had

the right to examine the jurors himself, or that Mr. Rubin could represent him in that connection, or that if he did not want Mr. Rubin to help him the judge would appoint an attorney other than Mr. Rubin to advise appellant, and that the actual trial would commence the next day, June 9th, at the latest. Mr. Rubin again objected to being appointed to represent appellant. Appellant stated that he was being denied the privilege of having an attorney of his choice, that he did not care to proceed with Mr. Rubin, that he did not believe Mr. Rubin was qualified and for that reason he had refused his services. Thereupon an adjournment was taken until 1:30 p.m. of that day.

At said last mentioned time Mr. Rubin asked that his appointment as counsel be terminated. The judge denied the motion, and stated that the trial would proceed at that time, and that if the appellant desired to examine the jurors himself he might do so. The judge also appointed Mr. Colvin for the purpose of consulting with appellant and advising him of his rights. Appellant stated that he had no faith in counsel appointed by the court, and that he did not care to examine the jurors himself. Mr. Colvin stated that he had no knowledge of the circumstances of the matter and that he did not think he was qualified to examine the jurors but he would be glad to assist the appellant. Then the appellant said: "If I am to go to trial with the attorneys, the court attorneys present here, might I at least have the Court's consent or permission to let Mr. Rubin act as my counsel? He has at least appeared in court once with me before and I believe would know a little something of the proceedings." Then the court said, "You prefer Mr. Rubin acting alone?" The appellant said, "That is entirely up to the discretion of the court." Then the court, upon the request of Mr. Colvin and the appellant, excused Mr. Colvin as counsel. A jury was then impaneled and sworn to try the issues in the case. Mr. Rubin then objected to the proceedings in the case on the ground that the appellant was being deprived of his constitutional rights. Appellant then stated that Mr. Rubin was not the attorney of his choice, "as provided for under the Fourteenth Amendment of the Constitution of the United States," that Mr. Rubin was not qualified and he did not have confidence in him; that he reposed his confidence in Mr. Lavine; that he accepted Mr. Rubin only under the force of the court's order. Then an adjournment was taken until the next day, June 9th, at 1:30 p.m.

At said last mentioned time the trial proceeded, the appellant being represented by Mr. Rubin. On June 11th, the jury returned its verdict of guilty. The insanity issue was tried on June 14th, the appellant being represented by Mr. Rubin. On July 9, 1948, Mr. Rubin as counsel for appellant made a motion for a new trial, and in his ''Specification of Errors'' in connection with that motion he asserted that the court erred in denying a continuance of the trial and in compelling appellant to go to trial with an attorney without previous experience in such cases. The motion for a new trial was denied.

The case was set for trial on April 27th, which was two months after appellant had entered his pleas. On April 27th, when it was represented to the court that appellant's counsel Mr. Lavine was then engaged in another trial, and when a motion for a continuance was made, appellant was granted a continuance of approximately six weeks, that is, to June 7th. On June 7th, when another motion for a continuance was made on the same ground, namely, that Mr. Lavine was engaged in another trial, it was represented that the arguments in the other trial were then being presented to the jury and that the case was almost concluded. It was also said at that time that about a week later Mr. Lavine would have to start a trial in the federal court which would require about two months. The trial judge denied the motion for a continuance, but he did continue the matter until the next day, June 7th, at 1:30 p. m., when the examination of prospective jurors was commenced. After the jury had been selected in the afternoon of June 8th, he continued the matter until the next afternoon, June 9th. In other words, after it was stated on June 7th at 10 a. m. that the arguments were then being made in the other case which Mr. Lavine was trying and that the case was almost finished, the trial judge herein continued the case one and one-half days before starting the selection of the jury, and two and one-half days before starting the testimony. It does not appear why the continuances, from session to session of the court, were made, but it might well be that the trial judge anticipated that, during those continuances, the arguments in the other case might be finished, which arguments allegedly were about finished on June 7th when the motion for a continuance was made. In any event, the effect of such continuances was to afford Mr. Lavine an opportunity (2½ days) to finish the other case and to appear in the present case.

In the case of *People* v. *Dorman,* 28 Cal.2d 846 [172 P.2d

686], a defendant who had been convicted of murder in the first degree, contended that the trial court violated his constitutional rights by refusing a requested continuance. The court therein held that appellant's rights were not violated. In that case, in referring to the case of *Avery* v. *Alabama*, 308 U.S. 444 [60 S.Ct. 321, 84 L.Ed. 377], wherein a similar question was involved, the court said at page 850: "The sole question there presented was whether, in violation of the Fourteenth Amendment, the petitioner was denied the right of counsel, with the accustomed incidents of consultation and opportunity of preparation for trial, where, after appointment of competent counsel, the trial court denied a continuance. The Supreme Court observed that the disposition of a request for continuance was a matter for the exercise of the court's discretion and not ordinarily reviewable. However, it was pointed out, the denial of any representation at all would constitute a clear violation of the Fourteenth Amendment; and denial of opportunity by appointed counsel to confer, to consult with the accused, and to prepare his defense, could convert the appointment into a sham and nothing more than a formal compliance with the Constitution's require-.ment that an accused be given the assistance of counsel, and would not satisfy the Constitution's guarantee. [Citing case.] In the Avery case the petitioner was convicted of murder and the death penalty was imposed. He had been arraigned on March 21, 1938, when the court appointed two practicing attorneys to represent him. His trial was set for March 23d. It was not reached then but was called the next day when the attorneys moved for a continuance on the ground that, being busy with other trials, they had not had time to prepare the defense. Apparently the motion was denied for the trial proceeded, and a motion for a new trial, made on the ground that denial of a continuance deprived the defendant of equal protection of the laws, was denied. In concluding that the petitioner had not been deprived of the benefit of counsel guaranteed by the Fourteenth Amendment, the court examined the record and found that appointed counsel 'performed their "full duty intelligently and well" . . . Their appointment and the representation rendered under it were not mere formalities.' At page 452 it was said: 'That the examination and preparation of the case, in the time permitted by the trial judge, had been adequate for counsel to exhaust its every angle is illuminated by the absence of any indication, on the motion and hearing for new trial, that they

could have done more had additional time been granted.' ''

The record in the present case, which includes the arguments to the jury, shows that Mr. Rubin, as counsel for appellant, performed his full duty intelligently and well; that his representation of appellant was not a mere formality, but was an able, earnest, and thorough representation throughout the trial. His arguments to the trial judge and the jury, his cross-examination of witnesses, and his objections to questions and procedure establish that he was well informed concerning the law and the facts in the case, and that he was alert and immediately ready to meet and to present the legal and factual questions involved. The reporter's transcript consists of 447 pages and this opinion should not be extended by referring to and quoting the portions thereof which illustrate that appellant's counsel represented him in the manner above stated. In the case of *People* v. *McNabb,* 3 Cal. 2d 441, the court said at page 448 [45 P.2d 334] : ''In short, the voluminous record is a formidable answer to any claim that counsel was not fully prepared for trial.'' In the case of *People* v. *Ives,* 17 Cal.2d 459 [110 P.2d 408], wherein the defendants had been convicted of murder in the first degree and wherein one of the appellants had been represented by an attorney appointed by the court, it was contended that his attorney, who had been admitted to the bar one year, was incompetent to properly represent that appellant. The court therein said at page 477 : ''The reason advanced [referring to admission to the bar] is hardly pertinent in gauging the competency of an attorney to conduct a murder trial. He might have had twenty years of experience in the trial of civil cases and yet be grossly incompetent to defend one upon a charge of murder. One may be specially adapted to try criminal cases, irrespective of the length of time he has been practicing . . .. The best criterion of the competency, care and alertness of the attorney referred to is the record in the case.'' In the present case it does not appear that a more seasoned attorney could have done more in representing appellant than was done by appellant's counsel. The appellant admitted orally and in his letters that he killed his wife. He was permitted to give his testimony in narrative form, and he was not cross-examined. On appellant's motion for a new trial the trial judge considered his assertion that the court had erred in denying the motion for a continuance, and in compelling him to go to trial with Mr. Rubin as his attorney. The denial of the motion for a new trial indicates that the trial

judge, who of course had observed the manner in which appellant had been represented at the trial, was of the opinion that counsel for appellant had performed his full duty intelligently and well. The appellant was not deprived of "due process of law." None of his substantial rights was prejudically affected by the denial of his motion for a continuance.

The judgment and the order denying the motion for a new trial are affirmed.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied June 6, 1949, and appellant's petition for a hearing by the Supreme Court was denied June 23, 1949. Carter, J., voted for a hearing.