[Crim. No. 5430. In Bank. Sept. 22, 1953.]

THE PEOPLE, Respondent, v. JOHN SUTIC, Appellant.

484

Donald D. Boscoe, under appointment by the Supreme Court, Willens & Boscoe and Richard J. Gibson, for Appellant.

Edmund G. Brown, Attorney General, Doris H. Maier, Deputy Attorney General, Chester E. Watson, District Attorney (San Joaquin), and Richard E. Johnson, Deputy District Attorney, for Respondent.

SPENCE, J.—Defendant was charged by information with the murder of Lading Borellano, Jr. He pleaded not guilty. At the trial he neither testified nor produced any witnesses. The jury returned a verdict of first degree murder, without recommendation, based wholly on circumstantial evidence.

Motions for a new trial and for a reduction of the verdict to second degree murder were denied. Judgment was thereafter pronounced and the death penalty was imposed. The cause comes to this court upon an automatic appeal. (Pen. Code, § 1239, subd. (b).)

As grounds for reversal, defendant argues these points: (1) insufficiency of the evidence to sustain the verdict; (2) error in the trial court's refusal to reduce the verdict; (3) error in the trial court's failure to instruct on the crime of manslaughter; (4) misconduct of the jury; and (5) prejudicial misconduct of the deputy district attorney arising from two aspects—the introduction of certain exhibits in evidence and his closing remarks in argument to the jury. An examination of the record compels the conclusion that defendant's arguments are without merit, and the judgment of conviction must be affirmed.

Defendant lived about one-third of a mile from the Borellano family near the city of Manteca. He raised chickens on part of his land, and he sold eggs to the Borellanos. They had been on friendly terms for several months, and defendant was a frequent visitor in the Borellano home. However, some few weeks before the date of the homicide, October 11, 1952, a dispute arose between them over a $12.50 egg bill, which the Borellanos refused to pay because of an alleged overcharge and the further claim that defendant had tried to poison their dog, with the result that they had incurred a $9.00 veterinary bill. According to Mrs. Borellano, defendant came to her home and quarreled with her over the bill, using "harsh words." One of the neighbors testified that about October 1st defendant expressed his intention of calling on the Borellanos to collect the bill, and when it was suggested that they might "gang up" on him, defendant replied: "I have a gun." Another neighbor testified that defendant, in discussing about that same time the unpaid egg bill, seemed "to get very mad, very red in the face" and said that "he was going to get Borellano; he was going to smash him in the face; he was going to kill him."

On October 11, 1952, about 7:45 p. m. Mr. Borellano and his 9-year-old son, the deceased, were driving home from Stockton. As they approached a country lane intersection about one-third of a mile from their home, Mr. Borellano observed defendant sitting in his car, which was parked on the left side of the road facing the Borellanos. It was then

about 8:10 p. m. The headlights of both cars were burning, so that Mr. Borellano, traveling about 25 miles per hour, recognized defendant and his car, which was distinctively painted—a cream-yellow body with lighter-colored fenders. Within a few minutes the Borellanos reached home. Mr. Borellano put his car in the garage, and then he and his son prepared for bed. Mr. and Mrs. Borellano occupied the front bedroom, an enclosed porch with two large windows facing the roadway. The children slept in an adjoining room, the deceased occupying the upper bunk of a double bunk bed, which was next to the partition separating the parents' sleeping quarters from the children's bedroom. Mrs. Borellano had already retired, and Mr. Borellano extinguished the lights in the house at 8:25 p. m.

The Borellano home was a small three-bedroom house set back from the roadway some 50 feet. A sparse hedge approximately 5 feet high extended along the shoulder of the road in front of the house. The distance between the house and the hedge was about 34 feet, and a car could drive alongside the hedge. About 8:30 p. m., as Mr. and Mrs. Borellano were lying in bed but not asleep, they heard a car stop in front of the house. Mr. Borellano raised up in bed, pulled aside the curtains of the window directly overhead, and saw a car parked with the headlights burning. He recognized the car from its color as belonging to defendant, and he called to his wife: "John's (defendant) there. I don't know what is he want. How come he park there." At that moment of Mr. Borellano's parting of the curtains as he looked out the window, two shots were fired in rapid succession, and Mr. Borellano hollered "John's shooting." Defendant's car then left the scene. The first bullet struck Mr. Borellano in his left arm; the second bullet, traveling through the front bedroom into the children's room, lodged in the head of the deceased as he slept in his upper bunk, causing his death a few hours later in the hospital where he was taken for treatment.

An attendant at a nearby service station testified that defendant drove his car into the station somewhere around 8:30 p. m.; that he turned in "rather fast," nearly hitting a gas pump; that he was a regular customer but had never before come so late in the evening, as he always said that he was afraid to drive after dark; that he purchased some gasoline and left a flashlight to be repaired; that he then went to the lunch counter on the premises for some coffee, and while sitting there on a stool "sideways" instead of "straight as

anybody else would," he kept a constant watch on the corner intersection; and that he stayed there about 15 or 20 minutes. The proprietor of the service station corroborated this account of defendant's visit and the approximate time thereof. Defendant drove out of the station in the direction of his home.

Meanwhile Mrs. Borellano had reported the shooting to the sheriff's office and about 9 p. m. two deputies arrived at her home. They noted that the front wall of plywood sheeting had been penetrated by two bullets, one hole being below the casing of the window about 4 feet above the ground and the other hole above the casing. One bullet from a .38 caliber gun was found at the end of the bedspread in the Borellanos' front bedroom; the second bullet was removed from the skull of the deceased at the time of the autopsy the next day. Mrs. Borellano told the officers that defendant was a possible assailant, and the officers then proceeded to his home, about one-third of a mile away, arriving there at approximately 10:40 p. m.

Defendant lived in a small two-room cabin. As the officers entered the driveway of his property, a light which was burning in the cabin was extinguished. Leaving the lights of their patrol car burning, the officers knocked on the cabin door and took turns calling out that they were "sheriff's officers" and "would like to talk" to defendant. The officers so continued for some 20 minutes but defendant did not answer. Defendant's arrest was finally accomplished as he emerged from the doorway after the officers had thrown a can of tear gas through a hole broken in the front door. When the officers asked the reason for his failure to answer their first calls to him, defendant said that he was asleep and hard of hearing; and that then when their noise finally did awaken him, he thought that he was being taunted by hoodlums in the neighborhood. He "cussed" the officers for using tear gas and when asked if he had a gun, defendant replied that he did not but "if I had one, I would have shot it out with you." Defendant stated that he had had two guns but they were stolen, one in July, 1952, and the other the preceding December, both Smith and Wesson .38 type. In defendant's cabin and likewise in the trunk of his car, which was in the garage, there were found boxes containing .38 shells. Defendant admitted that he knew the Borellanos, and he made some derogatory remarks about the family. He further added that their dog was "killing my chickens"; that he had given the dog "some

sleeping pills, made him sick'' but did not poison him. When asked as to his whereabouts that evening, defendant stated that he had been home since 6 p. m. One of the officers noticed that the radiator of defendant's car was still warm. When questioned about this, defendant stated that he had gone into the yard to feed his dogs about 9:30 or 10 p.m., and he had turned on his car lights to see and had run his motor to conserve the battery.

In a statement to a police officer a few days later, defendant gave this account of his activities on October 11th: that after finishing work about 4:30 p. m. he drove to a bar for some drinks, continued to a friend's house for more drinks, went to the service station where he bought gasoline and had some coffee, reached home at 7 p.m., and did not go out again that evening. Defendant repeated that his two guns had been stolen, admitted that he had shells in his cabin but denied knowledge of any in his car. A witness for the prosecution testified that defendant in May or June, 1952, showed her a gun which he was carrying in his pocket, and that he then said that he had another gun in his cabin. Upon the testimony of the proprietor of a sporting goods store in Portland, it was established that defendant had there bought on April 18, 1951, two .38 Smith and Wesson revolvers and had signed the required police records covering such purchase. A state criminologist identified the two bullets which respectively struck Mr. Borellano and his son, the deceased, as fired from a .38 caliber Smith and Wesson revolver. No gun was introduced in evidence. The doctor who performed the autopsy testified that his examination of the deceased's head disclosed the bullet in evidence, and that the death was due to the bullet's laceration of the brain.

In this state of the record, with the evidence clearly showing that a murder had been committed and pointing directly at defendant as the perpetrator of the crime, defendant failed to take the stand to deny or explain, if he could, any of the numerous circumstances which indicated his guilt. Nor did defendant present any witnesses on his behalf or offer any instructions. The theory of the defense, appearing from the extrajudicial statements made by defendant to the investigating police officers and presented as part of the prosecution's case, rested on the sole claim that defendant was not at the scene of the shooting but was at home at that time, and furthermore, he did not then possess any guns, as they had been previously stolen. As above stated, the jury found defendant

guilty of murder in the first degree, without recommendation. Defendant then moved for a new trial on the statutory grounds or for reduction of the degree of the crime on the claim that the evidence was insufficient to indicate that he had the requisite intent to justify a verdict of first degree murder. Both motions were denied.

The first question presented is whether the evidence is sufficient to support a conviction of murder in the first degree. The instructions authorized the jury to return a verdict of first degree murder on one or both of two theories: the murder was willful, deliberate, and premeditated, or it was perpetrated by means of lying in wait.[1] There is substantial evidence to support both theories.

■ A homicide is murder of the first degree when the accused, as the result of deliberation and premeditation, intended to take unlawfully the life of another. (Pen. Code, § 189; *People* v. *Martinez*, 38 Cal.2d 556, 561 [241 P.2d 224].)

■ There is ample evidence of deliberation and premeditation here. Some two weeks before the shooting defendant had a quarrel with the Borellanos over an unpaid egg bill, had used ''harsh words'' in discussing it with Mrs. Borellano, and had poisoned their dog. He had made verbal threats before disinterested parties that he intended to kill Mr. Borellano, and in the course of such conversations defendant admitted that he had a .38 caliber revolver. Prior to their quarrel defendant had frequently visited the Borellanos' small home and was familiar with the interior, including the family's sleeping arrangements. Defendant was positively identified by Mr. Borellano as sitting alone in his car parked on the road on the evening in question, a short distance from the Borellano home. Some 15 or 20 minutes later after all lights had been extinguished in the Borellanos' home, the shooting occurred when Mr. Borellano looked out the bedroom window and saw defendant's car stopped in front. From these circumstances clearly pointing to defendant's shooting at Mr. Borellano in consequence of some two weeks' brooding over a fancied grievance with the Borellano family, the jury could justifiably conclude that the killing was deliberate and premeditated. The fact that not Mr. Borellano but rather his son was killed does not alter the situation. ■ ''Where

---

[1]Penal Code, section 189, provides: ''All murder which is perpetrated by means of . . . lying in wait . . . or by any other kind of willful, deliberate, and premeditated killing . . . is murder of the first degree.''

a person purposely and of his deliberate and premeditated malice attempts to kill one person but by mistake or inadvertence kills another instead, the law transfers the felonious intent from the object of his assault and the homicide so committed is murder in the first degree.'' (*People* v. *Suesser,* 142 Cal. 354, 367 [75 P. 1093]; *People* v. *Pivaroff,* 138 Cal. App. 625, 628 [33 P.2d 44]. See, also, *People* v. *Walker,* 76 Cal.App.2d 10, 14 [172 P.2d 380].)

Defendant cites certain time variances as inconsistent with his presence at the scene of the homicide: the shooting having occurred at or about 8:30 p.m. and yet he was purportedly seen at a service station about a mile from the Borellanos' home between 8:30 and 9 p. m. that evening. But the time references plainly allowed a half hour spread and could be reconciled with the distance factors. These were matters for the jury's consideration. (*People* v. *Mandell,* 48 Cal. App.2d 806, 813 [120 P.2d 921].) Particularly significant is the jury's apparent disbelief of defendant's assertion to the police officers at the time of arrest that he had not been out of his house since 6 p. m. that evening. Under the circumstances the evidence amply establishes defendant's guilt of the killing in question (*People* v. *Green,* 13 Cal.2d 37, 42 [87 P.2d 821]), and its classification as a deliberate and premeditated act (*People* v. *Dessauer,* 38 Cal.2d 547, 550 [241 P. 238]; *People* v. *Martinez, supra,* 38 Cal.2d 556, 561; *People* v. *Gilliam,* 39 Cal.2d 235, 238-239 [246 P.2d 31]).

The evidence also supports the theory that the murder was perpetrated by means of ''lying in wait'' and was murder of the first degree by force of the statute. (Pen. Code, § 189.) Defendant argues that the term contemplates a concealment for the purpose of taking the victim unawares (*People* v. *Tuthill,* 31 Cal.2d 92, 100 [187 P.2d 16]), and that here Mr. Borellano testified that he had seen defendant sitting in his car on the open road some 15 minutes before the fatal shooting at the Borellanos' home. However, the cited case expressly states that the term has been applied to ''a number of factual situations wherein the victim has been aware of the physical presence of the aggressor'' (p. 100) and is not limited only to instances of ''concealment in ambush'' (p. 101). The elements of ''waiting, watching, and secrecy all were present'' here, from which the jury could infer that the ''lying in wait'' was a part of defendant's plan to take his victim later by surprise. Accordingly, that issue was

properly submitted to the jury under instructions similar to those approved in the Tuthill case (pp. 99-100).

As above discussed, the evidence fully justified the jury's finding that the homicide was the result of defendant's intent to kill and was accomplished by his "lying in wait" until the opportune time to strike, *or* that the homicide was a "willful, deliberate, and premeditated" act, without finding as to "lying in wait." In either event it was murder in the first degree. (Pen. Code, § 189; *People* v. *Gibson*, 92 Cal.App. 2d 55, 70 [206 P.2d 375].) Under such circumstances neither the trial court nor this court would be authorized to reduce the degree of the crime. (*People* v. *Daugherty*, 40 Cal.2d 876, 884-886 [256 P.2d 911].) Nor can the imposition of the death penalty be successfully assailed. (*People* v. *Jackson*, 36 Cal.2d 281, 288 [233 P.2d 236]; *People* v. *Thomas*, 37 Cal.2d 74, 77 [230 P.2d 351].)

The trial court did not err in failing of its own motion to give an instruction on the crime of manslaughter. As above indicated, defendant did not himself offer any instructions. He now argues that there was evidence from which it could be inferred that the Borellanos' assailant discharged the shots into their home with intent only to frighten the occupants, and not to kill. In such event he claims that he could be found guilty only of involuntary manslaughter. (*People* v. *McGee*, 31 Cal.2d 229, 238 [187 P.2d 706].) However, "jury instructions must be responsive to the issues" and they "are determined by the evidence." (*People* v. *Carmen*, 36 Cal.2d 768, 772-773 [228 P.2d 281].) Here there was no evidence to support the theory of manslaughter. The only defense presented in any manner by the record was defendant's claim to the arresting officers that he was not at the scene of the shooting but was at home that entire evening, and further that he had no guns then in his possession because they had previously been stolen. With strong evidence presented by the prosecution and pointing to him as the perpetrator of the crime in carrying out a deliberate and premeditated design to kill, defendant neither took the witness stand nor made any showing that the killing was committed in the heat of passion (*People* v. *Best*, 13 Cal.App.2d 606, 608-610 [57 P.2d 168]) or for the purpose of frightening the Borellanos (*People* v. *McGee, supra*, 31 Cal.2d 229, 238; *People* v. *Carmen, supra*, 36 Cal.2d 768, 773-776).

Defendant suggests that since the shooting was done from a car parked alongside the hedge behind which the Borellanos'

home was set back 34 feet, it could reasonably be inferred that the assailant was merely firing two random shots in the general direction of the house with no intent to kill. But the accuracy with which the shots were fired clearly shows that precise aim was taken. The first shot was not fired until after Mr. Borellano had pulled aside the curtain of his bedroom window, and he was struck in the arm; the second shot was directed higher, above the casing, so that it could have been expected to hit Mr. Borellano in the head, but instead it traveled until it penetrated the head of the deceased as he slept in his upper bunk in the adjoining room. Upon such a record defendant was either guilty of murder or not guilty of any crime, if the jury should believe his defense of physical absence from the scene of the homicide. There was no evidence upon which a manslaughter conviction could be based, and therefore an instruction on that subject was inapplicable. (*People* v. *Alcalde*, 24 Cal.2d 177, 188 [148 P.2d 627]; *People* v. *Mandell, supra*, 48 Cal.App.2d 806, 817; *People* v. *Gibson, supra*, 92 Cal.App.2d 55, 71; *People* v. *Stembridge*, 99 Cal. App.2d 15, 21 [221 P.2d 212].) ■ As was said in the Stembridge case at page 21: "The jury was fully instructed as to the crime of murder and were told in effect that if they were not satisfied that the defendant was guilty of that offense they must acquit him altogether. It is to be presumed that the jury heeded the court's instruction in this respect and performed their whole duty in accordance with it; that if they were not satisfied beyond a reasonable doubt that the defendant was guilty of murder, under the instructions they would have acquitted him. (*People* v. *Watts*, 198 Cal. 776, 796 [247 P. 884].)" In passing, it might be mentioned that defendant's manslaughter claim is a new point presented on appeal. He made no reference to it at the time of his motion for a new trial or for the reduction of the degree of the offense to second degree murder.

■ Defendant complains of misconduct on the part of the jury. It appears from the record that after some two and a half hours' deliberation, the jury returned and the foreman announced the verdict as murder in the first degree, without recommendation. The jury was then polled and one member expressed doubt as to full understanding of the meaning of the verdict. The court thereupon ordered the jury to deliberate further. About an hour later the jury returned with the same verdict, and the poll showed the unanimous agreement of all the jurors thereon. Now by an affidavit (lodged with

this court a few days prior to oral argument) the originally doubtful juror claims that on the jury's return for the second deliberation, she was coerced by the other jurors to subscribe to the original verdict; that they represented that defendant was "no good anyway because he had been arrested for operating a bawdy house in Oklahoma," according to one of the exhibits in evidence, and that "he would get another chance because the Supreme Court would review the evidence." Defendant's previous conviction for operating a disorderly house, a misdemeanor, appeared from a questionnaire which he had executed for the police department. No objection was made to the introduction of the questionnaire in evidence as an exemplar of defendant's handwriting in comparison with that on the fingerprint card and on the gun purchase records executed by defendant in Oregon. Defendant makes no claim that the questionnaire was offered by the prosecution in bad faith but simply argues that it was "highly prejudicial" on a record where the evidence of guilt is wholly circumstantial. However, "it is well settled that jurors are legally disabled to impeach their verdict by any means, whether it be by affidavit or by testimony or by extrajudicial statements, except only in the cases provided by statute." (*People* v. *King*, 40 Cal.App.2d 137, 143 [104 P.2d 521], and cases there cited.) The facts on which defendant relies do not come within the exception. (See *People* v. *Giminiani*, 45 Cal.App.2d 535, 539-540 [114 P.2d 392].)

 Defendant finally makes the claim of prejudicial misconduct on the part of the deputy district attorney. In this connection he first argues the impropriety of the introduction in evidence of two photographs of the deceased, one showing the back of the boy's head with the bullet hole and the other showing him lying prostrate, face upward, on a slab in the morgue. The photographs were used for identification purposes by the doctors who treated the boy at the hospital on the night of the shooting and also by the autopsy surgeon with reference to his examination the next day. They were put in evidence without objection by defendant and, in fact, defendant's counsel acquiesced therein. They were admissible as relevant to the testimony of the medical witnesses with regard to the condition of the deceased's body after the shooting and the establishment of the gunshot wound as the cause of death. (*People* v. *Osborn*, 37 Cal.2d 380, 383 [231 P.2d 850], and cases there cited. Later the photographs were shown

496

to the deceased's mother, who wept profusely upon identifying them. Defendant made no objection to such showing to her nor was such action cited as misconduct. Now he claims that the jury after seeing the mother's emotional reaction could not dispassionately consider the case. But the photographs had evidentiary value in the presentation of the medical testimony, the procedure of their identification by the deceased's mother was not challenged by defendant, and he cannot now successfully claim error in the court's discretionary handling of this phase of the case. (*People* v. *Gulbrandsen*, 35 Cal.2d 514, 521-522 [218 P.2d 977]; *People* v. *Agnew*, 77 Cal.App.2d 748, 763 [176 P.2d 724].)

Defendant next complains of prejudicial remarks made by the deputy district attorney during his closing argument to the jury. He lists several instances where comment was made on defendant's failure to testify. Such references are authorized by both our Constitution and our statute (Const., art. I, § 13, as am. 1934; Pen. Code, § 1323), and defendant made no objection thereto in the trial court.

In the absence of such objection, it is the general rule that misconduct of the prosecuting attorney cannot be availingly urged on appeal. (*People* v. *Adamson*, 27 Cal.2d 478, 494 [165 P.2d 3]; and cases there cited.) Moreover, in the majority of instances these comments were properly limited to specific parts of the evidence that defendant could reasonably be expected to explain or deny. In its instructions the trial court expressly recognized defendant's constitutional right not to be compelled to testify and that his failure to explain or deny any evidence against him did not relieve the prosecution of its burden of proving every essential element of the crime and defendant's guilt beyond a reasonable doubt. Defendant also cites various remarks by the deputy district attorney as "inflammatory" and "intemperate." Without detailing the assailed language, suffice it to say that the remarks were in the main statements of the evidence or reasonable inferences drawn therefrom, and they did not transcend the bounds of permissible argument. At the time they were made defendant did not assign them as error or ask that they be stricken, or request that the jury be asked to disregard them or that the deputy district attorney be reproved for misconduct. Furthermore, the trial court during the course of the trial and in its instructions admonished the jury that it was to be governed solely by the evidence introduced in the case and not by statements made by counsel.

Under the circumstances defendant's belated criticism cannot now prevail. (*People* v. *Codina,* 30 Cal.2d 356, 362 [181 P.2d 881] ; *People* v. *Amaya,* 40 Cal.2d 70, 79 [251 P.2d 324].) It may be noted that the trial court in ruling on defendant's motion for a new trial, specifically found that "there was no reversible misconduct on the part of the deputy district attorney nor is there any reason to believe that the jury was moved by passion and prejudice."

The judgment and the order denying the motion for a new trial are affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., and Traynor, J., concurred.

SCHAUER, J., Concurring.—Upon the facts of this case I concur in the judgment and generally in the reasoning leading to the conclusion.

I do not join in the implied blanket approval of all the instructions said to have been "approved in the Tuthill case" (referring to *People* v. *Tuthill* (1947), 31 Cal.2d 92, 99-101 [187 P.2d 16]).