[Civ. No. 14629. First Dist., Div. Two. Oct. 25, 1951.]

WALTER A. SHAFF, a Minor, etc., Appellant, v. DONALD H. BALDWIN et al., Respondents.

---

Ricksen, Freeman & Johnson and Belli, Ashe & Pinney for Appellant.

Hoge, Pelton & Gunther, Reginald M. Watt, Clark & Heafey and Edwin A. Heafey for Respondents.

NOURSE, P. J.—This is an appeal by the plaintiff in a negligence action. Walter A. Shaff, the minor plaintiff, was seriously injured in a collision between the automobile he was driving and a tractor owned by defendant Baldwin and driven by defendant Hissong, which tractor was pulling a trailer owned by defendant E. J. Willig Truck Transportation Company. Near the end of the trial a motion to render a nonsuit as to the defendant E. J. Willig personally was granted on stipulation and a motion to the same effect made on behalf of E. J. Willig Truck Transportation Company, on the ground that that company was not an employer of Hissong but that between the company and Hissong's employer Baldwin there was a relationship of independent contractor, was granted on November 16, 1949, after opposition by plaintiff. The verdict was in favor of defendants Baldwin and Hissong. Plaintiff moved for a new trial but dismissed his motion giving as ground that he had failed to file the required affidavits. He appealed both from the judgment and order of November 16, 1949, granting the nonsuit as to defendant E. J. Willig Truck Transportation Company and from the judgment on the verdict in favor of the two remaining defendants.

The appeal from the judgment on the verdict is based solely on alleged misconduct of the attorney of defendant, Mr. Hoge, in stating in his closing argument to the jury certain parts of the deposition of plaintiff not read into evidence at the trial. For the consideration of the greater or lesser importance of said grievance some knowledge of the facts and evidence is required.

The accident happened on June 22, 1948, at about 6:30 a.m. on State Highway 50 between Livermore and Tracy about a mile east of the crest of the Livermore Pass. Highway 50 is there a four lane highway going east-west. Plaintiff and his friend Krenkel were going in an easterly direction (to Yosemite) in plaintiff's car, a 1931 Chrysler convertible with a 1938 Ford V-8 motor and a Buick steering wheel larger than the original one; it had no front fenders or running boards. Plaintiff was driving. The tractor and trailer, a large van trailer loaded with beer, were also going in an easterly

direction. Plaintiff passed it when it was going very slowly uphill in the outside lane before or at the crest. Plaintiff whose speed was probably between 35 and 40 miles went back to the outside lane after passing it. After passing the crest he saw before him in the same outside lane a slow moving automobile on which he gained. The evidence is insofar without conflict that when the Shaff car and the truck had left Livermore Pass and were going downhill all three vehicles involved were in the outside lane, lowest down the slow car (later found to be the one of Mr. and Mrs. Zumbrun) behind that the Shaff car, gaining on the Zumbrun car, and behind that the tractor and trailer, now that it was going downhill gaining on the Shaff car. It is also undisputed that plaintiff wished to pass the slow car in front of him and that Hissong, the driver of the tractor, also wished to pass. The essential difference between the position of the parties relates to who first left the outside lane for the middle lane for the purpose of passing and to the giving of signals in that respect. Hissong testified that he saw the Shaff car drive downhill up to the Zumbrun car and remain behind it at a distance of 15 to 20 feet. He himself was then 200 to 300 feet behind the Shaff car. At that time he gradually went over to the inside lane giving two blasts on the horn when he started to change lanes. When he was completely in the inside lane he was still 50 to 100 feet behind the Shaff car, but when he had neared it to 3 to 15 feet, it shot out in front of him. Hissong pulled a chain to blow the horn and the impact followed immediately. Walter Shaff testified, corroborated by his friend Krenkel, that when he wished to pass the car in front of him and to turn into the inside lane he looked into his rear vision mirror and saw the truck about 100 feet or so behind him in the same lane. Shaff then signalled with his arm extended straight and proceeded to pull out. He got completely in the left hand (inside) lane and had driven 100 to 150 feet in it when he heard the blast of the horn and while he gave a hard yank to the right the collision happened instantaneously.

The evidence further showed that the gouge marks of the accident were on the southerly one third of the inside lane and a few on the outside lane, and that the right front wheel of the tractor was broken off but that otherwise the front of the tractor was scarcely damaged with even the bumper and fog lights intact. There was evidence of an expert that the fracture of the bearing of the front wheel of the tractor could only have happened the way it had if it was hit from behind

by an object traveling faster than the tractor. Not only were Shaff and Krenkel hurt in the accident, Shaff seriously, but the Zumbruns who were in the slow car were killed. A trial concerning the death of the Zumbruns in which Shaff testified had preceded the present case. A few hours after the accident Krenkel made a statement to the police officer, Krause, in the first aid room of the hospital to which he had been brought in which he said that he thought they were in the inner lane, but that they may have been in the other lane; that a truck was trying to pass them, that he blew his horn just as he was upon them, "I looked around and the truck was *to our left* right upon us." At the trial Krenkel testified that he did not remember having spoken to Officer Krause.

In cross-examining Walter Shaff, Mr. Hoge repeatedly tried to impeach him by reading earlier statements made in his deposition and at the Zumbrun trial. In his final argument he reverted to the parts read. Appellant complains of three instances in which Mr. Hoge during the argument read to the jury portions of the deposition allegedly not read before.

One of the three instances complained of was abandoned at the oral argument as it was shown to have been read into evidence. In a second instance there was a slight deviation but wholly without importance. The essential part on which the argument was based had been duly read to plaintiff, but in reading it again to the jury Mr. Hoge started a few lines too early. The extra lines so read contained only completely uncontroversial matter. No misconduct was assigned and clearly there was neither misconduct nor prejudice.

The third point, the only one requiring consideration, is as follows: During the argument Mr. Hoge read from the deposition: "Q. When you pulled the wheel, which way did you pull it? A. To my right. Q. And at that time, was any portion of your car in the passing lane, the inside lane or not? A. That I don't know." Here Mr. Ricksen, attorney for plaintiff, remarked that this was not covered and that it read in the corrected deposition: "After I pulled the wheel, I don't know." Mr. Hoge read the uncorrected version for the second time and Mr. Ricksen repeated the correction, which Mr. Hoge said was made after consultation with Mr. Ricksen. Mr. Ricksen said that he would answer that in argument. Mr. Hoge contended that he was entitled to bring to the attention of the jury the testimony as given before correction and declared that he was going to read it again. Mr. Ricksen then said that if Mr. Hoge would pursue covering testimony that was

not in the record of the case he was going to assign it as misconduct, ask the court to instruct the jury to disregard it. Mr. Hoge contended that it was in the record, that he had read it to Shaff and that Shaff had said that he gave that testimony. The judge stated that his problem was whether that had been done. Mr. Hoge repeated that it had. The court pointed out that Mr. Hoge was aware of the rule against comment on evidence that is not in the record. "Mr. Ricksen: All right, Mr. Hoge does so at his own peril. Mr. Hoge: All right, don't worry. Peril doesn't bother me in that regard." He read the passage again and commented on the fact that at that time, two months after the accident occurred, Shaff did not know whether any portion of his car was in that lane, and that now he had him not only come into the lane but run 200 feet in it before the truck ran into his rear.

It is now conceded by respondent that the exact portion of the deposition here complained of had *not* been read or shown to the plaintiff. Respondent contends that the essential point then being treated in the argument was that appellant had testified at the trial that his car was hit from behind whereas in the deposition he had said repeatedly that he did not know where the impact came from or what part of his car was hit.

The deposition as to that point had been read and the point had been referred to immediately before the reading of the passus attacked, but, certainly when respondent's comment is considered it is clear that the part of the car hit and the direction of the impact are a matter different from the place of appellant's car with respect to the inside lane. In this part of his argument Mr. Hoge was bringing up a discrepancy not in evidence and the jury was not instructed to disregard it because Mr. Hoge had assured the court that it had been read and had taken the risk of its being in evidence.

█ Stating in the argument facts not in evidence is a misconduct, which when deliberate and uncalled for may be a ground for reversal even when the court had admonished the jury to disregard the remarks (*Deibler* v. *Wright,* 119 Cal.App. 277, 283 [6 P.2d 344].) See, also, 53 Am.Jur. 385, et seq. § 480; 66 C.J.S. 128. Reading in argument to the jury of evidence taken at a former trial or hearing of the same case is also condemned as improper (53 Am.Jur. 394-95, § 489). The conduct of Mr. Hoge comes in the same category and the misconduct is aggravated by his unwarranted assurance to the court and his defying and provoking attitude.

Nevertheless the arguments against reversal must prevail.

██ When no reversal is required to prevent miscarriage of justice, no reversal ought to be granted for the sole purpose of punishing counsel (*Hulburd* v. *Worthington,* 57 Cal.App.2d 477, 479 [134 P.2d 832] ; *Jonte* v. *Key System,* 89 Cal.App.2d 654, 659 [201 P.2d 562]). ██ Appellant's only argument with respect to prejudice and miscarriage of justice is that the case was bitterly contested and that the attempted impeachment of plaintiff related to the essence of the case— the facts relating to the happening of the accident. However plaintiff's attorney himself does not appear to have considered the matter important, for he permitted the passus to be read twice to the jury without assigning misconduct or urging admonition to disregard. He requested such admonition only in case of further persistence, which could not then do much harm. This attitude seems in harmony with the true importance of the matter. The passus argued without prior reading was only one of many adduced to show that plaintiff was changing his testimony so as to strengthen his case. The other examples pointed out to the jury had actually been read to the plaintiff and acknowledged by him. Some of them related to nearly the same question and were more essential than the one which was incorrectly mentioned. For instance when asked whether he was not uncertain whether he had fully gotten into the inner lane when the accident happened plaintiff had answered at the trial in this case that he had fully gotten into it. Then prior testimony of his was read in which appellant had said that he *believed* he did and further : ''Well, I mean I wouldn't guarantee it, but I am almost positive of it.'' The question whether appellant was already completely in the inner lane when the accident happened is closely related to the one whether there was still part of his car in the inner lane when he turned back to the right, and is more important with respect to the essential problem who first turned into the inner lane and therefore had the right to be there. Another example of change of testimony for the same reason of greater importance than the one under attack is the following: During his cross-examination in this case plaintiff had denied that the accident happened when he turned to pass the car in front; his earlier testimony read to him and argued to the jury was: ''Well, I would say when I was, I was about one hundred feet behind it when I started to pass it and that is when the accident happened.'' Under these circumstances there is no reason to assume that one more minor example of change of testimony can have had

such influence on the jury as to require reversal. Moreover a reading of all the evidence of which part has been stated convinces us that the jury came to the correct result and that there is no miscarriage of justice in that respect.

■ Appellant argues that the above misconduct during the argument was the cumulation of a generally reprehensible attitude consisting in badgering of counsel and an attempt to create prejudice. However the only actual example stated is the us of the word "hot rod" to indicate plaintiff's car and at no time except during the repeated reading of the one passus treated before had there been any assignment of misconduct. It may be conceded that the tone of Mr. Hoge was sometimes unduly aggressive and demonstrative with respect to opposing counsel, but under the circumstances of the case there seems no ground to take that demeanor into consideration. The use of the word "hot rod," which had been used by defendant Hissong in his report to the police and was explained by him as relating solely to the looks of the car and not to the manner in which it was driven seems unprejudicial.

Our conclusion is that there is no ground for reversal of the judgment in favor of Hissong and Baldwin on the ground of misconduct of counsel.

■ With respect to the appeal from the order granting a nonsuit as to the defendant E. J. Willig Truck Transportation Company, appellant argues in the first place that the nonsuit was erroneous because there was evidence sufficient to go to the jury that although Baldwin was Hissong's general employer E. J. Willig Truck Transportation Company, herein further called Willig, also exercised part control over him sufficient to make him liable as his special employer. It is clear that as the judgment in favor of Hissong will be upheld this point has lost all importance because there can be no derivative liability of the special employer without liability of the employee. Nevertheless it may be stated succinctly that the holding that Willig as a matter of law was not liable as special employer of Hissong was correct, where the evidence showed without conflict that Hissong was in the pay and general employment of Baldwin, that Baldwin as well as Willig was in the general trucking business as a licensed highway carrier, that Baldwin made his tractor with driver (and also a trailer) available to Willig for hauls for which Willig had contracted, that Willig paid for each haul at the rates established by the Public Utilities Commission less certain deductions, that Baldwin had not relinquished to Willig the

power to discharge the driver and that, although Willig directed what to haul and where and when to go, not Willig but Baldwin was in control of the conduct of Hissong in his operation of the truck while in transit as it was Baldwin who gave the instructions as to route to be followed, speed to be maintained and maintenance of equipment (*Billig* v. *Southern Pac. Co.*, 189 Cal. 477 [209 P. 241]; *McComas* v. *Al. G. Barnes Shows Co.*, 215 Cal. 685 [12 P.2d 630]; *Lowell* v. *Harris* 24 Cal.App.2d 70, 81 [74 P.2d 551]; Restatement, Agency § 227; 16 Cal.Jur. 1109.)

 Appellant further contends that Willig himself could have been found negligent and his negligence proximately contributing to the accident because he loaded the truck so that the total weight according to some evidence was approximately 69,800 pounds and brought it on the road where according to some evidence it may have had a speed of 45 miles per hour at the time of the collision, whereas section 515 Vehicle Code prescribes a maximum speed of 40 miles for a truck of 25,000 pounds or more. The point is wholly devoid of merit. There is no contention that it is in any way illegal to bring on the road a truck loaded to that weight; there is no evidence whatever that the truck in question loaded to that weight was necessarily dangerous. For the speed of the truck even if driven 45 miles per hour Willig was not responsible. He was not the owner of the vehicle or the person employing or directing the driver and he did not require the operation of the vehicle at said speed. (See Veh. Code, § 731.)

Judgments and order affirmed.

Goodell, J., and Dooling, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 20, 1951. Carter, J., voted for a hearing.