[Crim. No. 3191. First Dist., Div. One. July 26, 1956.]

THE PEOPLE, Respondent, v. HENRY HERMAN WEBB, Appellant.

Murphy & Adams and George Olshausen for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

PETERS, P. J.—Defendant was charged with the murder of Steven Kirkendoll. He pleaded not guilty and not guilty by reason of insanity. The jury found him guilty, fixed the degree of the crime as first degree, recommended life imprisonment, and then found defendant sane. From the judgment entered on these verdicts, and from the order denying his motion for a new trial, defendant appeals.

The background facts are not substantially in dispute. Defendant was born in Texas in 1909 and lived there all his life. In 1931, when he was 22, he married Erma, then but 14½ years of age. The couple lived together in Texas until Erma secured a divorce on January 15, 1954. During this period they had nine children. Because of drought conditions starting in 1951, defendant suffered severe financial reverses. About November, 1953, Erma first met the deceased, Steven Kirkendoll. About the same time serious domestic difficulties, which, on occasion, erupted into violence, developed between defendant and Erma, and between defendant and several of his children. On several occasions Tommy and Frank, two of the couple's sons, intervened to prevent violence. Defendant testified that in February or March, 1954, Tommy and his wife threatened to kill him, and other witnesses testified to various threats made by Erma, Kirkendoll and Tommy during this period. In November, 1953, and January and February, 1954, Erma had the defendant arrested either for assault or breach of the peace.

As already pointed out, Erma divorced defendant on January 15, 1954, at which time Erma was pregnant, the child being born on August 13, 1954. The defendant was listed as this child's father.

On March 17, 1954, Erma and Steven Kirkendoll left Texas for California, taking the various minor children of defendant and Erma with them. They were married on March 19, 1954, in New Mexico, and continued on to California where they settled in Watsonville, living, ultimately, in a small bungalow.

In July, and again in September, 1954, defendant came to California to visit with his children. He testified that on each of these visits Tommy threatened to whip him, and Kirkendoll threatened to "knock [his] block off."

In November, 1954, defendant, in Texas, purchased a .22 calibre revolver, claiming that he did so to shoot rabbits on his ranch. Just before Christmas, 1954, he decided to visit his family during the Christmas holidays. He purchased a round-trip train ticket, carried no luggage, but did bring the revolver, unassembled, carrying it in his boot, testifying that he brought the gun because he feared for his safety, and denying that he brought it with the intention of shooting Kirkendoll. Just before the train reached Watsonville he assembled the gun, inserted a loaded cylinder, and put it back in his boot.

Defendant arrived in Watsonville at 4:25 a.m. Christmas morning, 1954, and took a taxi to the Kirkendoll bungalow, which was then occupied by Erma and Kirkendoll, six of Erma's children, and a niece of Erma's. Defendant knocked on the door, identified himself, and was admitted to the house. The parties exchanged Christmas greetings, defendant and Kirkendoll shook hands, and Kirkendoll got defendant a chair. Before sitting down, defendant kissed his children, some of whom were in the living room and some in the bedroom. He then sat down. Kirkendoll told his wife to warm some coffee, and proceeded into the bedroom and started to change the diapers on the baby. Erma went into the kitchen, and defendant followed her, asking for a drink of water, which she gave him. Defendant then returned to the living room and then entered the bedroom. Erma stayed in the kitchen. Several of those present testified that defendant then said to Kirkendoll: ''How did the blood test turn out?'' (referring to a blood test defendant desired to have taken to determine the fatherhood of the baby), to which Kirkendoll replied: ''It was coyote blood.'' Defendant then said: ''Just like mine,'' and Kirkendoll replied ''Yes, just like its father.'' Defendant testified that Kirkendoll appeared very angry, and reached towards a pillow on the bed. He stated that he was scared, that the conversation ''vexed'' him and also made him very angry. Defendant thereupon reached into his boot and brought out the gun. The testimony is to the effect that the defendant stood in the doorway after the quoted words were spoken for between 15 to 25 seconds and then started to shoot at Kirkendoll, who was only about 3 feet away. Defendant shot Kirkendoll several times, and Kirkendoll fell across the bed. Defendant then reached over and shot him again. Erma and her niece, Lois, testified that they heard defendant call Kirkendoll, a ''dirty yellow coyote,''

and say: "This is your Christmas greetings, Steve." Defendant put six bullets into the body of Kirkendoll, any one of which, according to the medical testimony, could have caused death. Two shots apparently went wild, because eight shots had been fired. The gun involved could shoot eight shots in four seconds.

Gloria, a daughter of the defendant and aged 8 at the time of trial, testified that after the shooting her father turned to her and told her that if she testified against him he would kill her. He then left the bedroom and went to the front door. He put his hand on his 13-year-old daughter Fern's shoulder and said: "I'm sorry."

In the meantime Erma ran out the back door, followed by several of the children, and went to a neighbor's house.

The defendant stuck the gun in his belt and left the house, looking for the police station. He asked one stranger for the location of the police station, but, becoming confused, went to a telephone booth at a service station. He was unable to get a response from the telephone, so he left the gun in the booth, where it was later found by the police, and went out, still looking for the police station. He saw an automobile ahead of him. Thinking it was the police, defendant called out: "Here I am, I am the man you want, I am the man you want . . . I killed a man." The two men in the automobile were in fact deputy sheriffs, and they turned defendant over to the Watsonville police. By the time the police got to the scene of the shooting the defendant already was at the police station.

Gloria, the 8-year-old daughter of defendant, testified that on one of his previous visits defendant had taken her into the bedroom and told her that "he would kill Steve if it was the last thing on earth he ever did." Defendant denied making this statement. Defendant testified that after the conversation with deceased about the coyote blood, deceased reached toward a pillow and said: "This is it." Defendant thought deceased was reaching for a gun, and he became very scared. He also testified that in Texas, where both defendant and deceased had lived, to call a man a "coyote" was a great insult; that such was the worst name you could call a man in Texas; that such term in Texas meant "fight" and "danger"; that when deceased called him a coyote he became both scared and angry, and that to him it meant that danger was at hand.

It should be noted that the chief of police testified that when he questioned defendant immediately after the arrest

he asked defendant: "Did he [Kirkendoll] make any move to attack you when you shot him?" to which defendant replied: "Not before I shot him, because he wasn't looking at me."

On this evidence the jury found the defendant guilty of first degree murder, and fixed the punishment at life imprisonment. Then defendant was tried on the insanity issue. Thirteen lay witnesses testified that defendant was insane, basing their opinions on the fact that defendant was obsessed with his family troubles, repeating them to the witnesses over and over again, and, since the divorce, had lost much weight, and had had a material change in physical condition. It was stipulated that if seven other lay witnesses were called they would all testify that defendant was insane.

Dr. Allegrini, a medical doctor with some background in psychiatry, testified that from his examination he concluded that defendant was "suffering from psychosis, a depressive type of psychosis," and felt so strongly about it that he recommended that Dr. Douglas Kelley, a psychiatrist, be called in. Dr. Allegrini was of the opinion that at the time of the killing defendant was "definitely insane."

Dr. Kelley examined the defendant in March of 1955. He gave it as his opinion that, at the time of the killing, defendant was "suffering from psychoses, reactive psychotic depression," and was insane. He was further of the opinion that defendant, at the time of the killing, could not distinguish right from wrong.

Three lay witnesses opined that defendant was sane, and two court-appointed psychatrists testified that in their opinion defendant was "legally sane" at the time of the killing.

The jury found defendant sane.

On this appeal defendant's counsel have raised many points and have briefed all of them ably and exhaustively. Appellant contends that most of the incriminating evidence against him was very weak and contains evidence of fabrication. Thus, he attacks the testimony of his 8-year-old daughter Gloria who first testified that she could not remember that appellant ever talked to her about the deceased, but, after some prompting and leading, testified that on a prior visit appellant had threatened to kill Kirkendoll. Certain inconsistencies are pointed out in the testimony of Erma, who, at the preliminary hearing, had failed to testify that appellant had said: "This is your Christmas greetings, Steve," but so testified at the trial. Moreover, in a statement given prior

to trial she denied that anyone had used the word "coyote," but at the trial stated that appellant called the deceased "a dirty yellow coyote." The testimony of an 11-year-old daughter of the appellant is also attacked. In a statement given by her shortly after the shooting she stated that she heard her father say "Here's my Christmas greetings to you, Steve," but also stated that she did not hear anything about a coyote or a blood test. But at the trial she testified about these last two matters in detail. An attack is also made upon the credibility of the niece, who witnessed the shooting. At the trial she testified that she heard appellant call the deceased "a dirty yellow coyote" and stating "Here is your Christmas greetings, Steve," but in a prior statement had said she could not remember just what was said before the shooting. She explained this by stating that when she gave the prior statement she was "nervous and torn up."

Based on these attacks, which appellant claims show fabrication, haziness and inconsistencies, it is urged that any errors that occurred were necessarily prejudicial. We turn to a consideration of the claimed errors.

During the "not guilty" trial, the court permitted lay witnesses to testify as to objective manifestations of "tenseness" and observable manifestations of emotional disturbance on the part of appellant, but excluded lay evidence to the effect that in the opinion of the witnesses appellant's mind was affected at the crucial time of the killing to an extent less than legal insanity, but to such an extent that the formulation of a specific intent was impossible. In sustaining objections to such testimony the trial court stated that a lay witness was permitted to testify only "on the issue of soundness or unsoundness of mind, which isn't an issue in this section of the trial," but couldn't give an opinion as to a mental state less than insanity. The court did permit Dr. Kelley to testify as to his opinion of appellant's mental state insofar as the ability to form the specific intent was concerned. Dr. Kelley's testimony was contradicted by the court-appointed psychiatrists.

It was probably error to exclude this lay opinion evidence. The leading case on the subject is *People* v. *Wells,* 33 Cal.2d 330 [202 P.2d 53]. There an element of the crime charged, a death penalty offense, was that it be committed with "malice aforethought." There, too, the defendant entered the double plea of not guilty and not guilty by reason of insanity. On the "not guilty" trial, evidence was excluded of

*physicians* (experts) who would have testified that because of abnormal physical and mental conditions not amounting to legal insanity the defendant did not act with malice aforethought but under fear for his personal safety and in the honest belief that he was defending himself from attack by certain officers. The Supreme Court held that the proffered evidence was admissible on the issue as to whether defendant had the requisite intent specified by the statute. In so holding, the Supreme Court made the following statements:

At page 350: "As a general rule, on the not guilty plea, evidence, otherwise competent, tending to show that the defendant, who at this stage is conclusively presumed sane, either *did* or *did not*, in committing the overt act, possess the specific essential mental state, is admissible, but evidence tending to show legal sanity or legal insanity is not admissible. . . . Evidence which tends to show legal insanity (likewise, sanity) is not admissible at the first stage of the trial because it is not pertinent to any issue then being litigated; but competent evidence, other than proof of sanity or insanity, which tends to show that a (then presumed) legally sane defendant either did or did not in fact possess the required specific intent or motive is admissible."

At page 356: "It must be borne in mind that insanity as a defense is one thing and that proof of the existence or nonexistence of the specific essential mental state, disjoined from any question of legal sanity, is quite another thing. . . .

"Triers of fact are often required, as were the jury in this case, to ascertain whether a nonobjective fact, a certain intent or state of mind, existed. . . . And in each case where such intention must be determined the trier of fact should have the advantage of being informed as completely as possible of such circumstances, in aid of appraisement of the ultimate, nonobjective fact."

The court then held that opinion evidence of a mental condition indicating the lack of a specific intent was admissible for the same reason that evidence of intoxication is admissible on the trial of the not guilty plea, and then continued (at page 357): "The fact that the accused was intoxicated can be proved both by testimony of the accused himself as to his condition and by testimony of competent observers as to their opinion of his condition. Likewise, the fact that the defendant here was in a state of nervous tension and subject to abnormal fears from slight stimuli can be proved by both such types of testimony. Defendant should not have been limited

to describing his own condition, testifying to his own purpose and belief, and denying that he acted with the purpose which the prosecution evidence tended to show. He should have been allowed, as was the prosecution, to present the testimony of persons who had observed behavior of defendant bearing on the ultimate fact of 'malice aforethought.' ''

The majority of the court then went on to hold that, although it was error to exclude the evidence, under the facts such error was not prejudicial.

In *People* v. *Gibson,* 92 Cal.App.2d 55 [206 P.2d 375], a murder case in which the double plea had been interposed, the trial court on the ''not guilty'' trial excluded evidence of the *defendant* that at the time he killed his wife certain things were preying on his mind based on his wife's past misdeeds, and excluded evidence of a *psychiatrist* that under such circumstances the defendant could have committed the crime without being conscious thereof. This was held to be error, but, under the facts, not prejudicial. (See also *People* v. *Letourneau,* 34 Cal.2d 478 [211 P.2d 865].)

The question presented in our case is whether or not *lay* witnesses may give their opinions as to state of mind short of insanity affecting the formation of a specific intent. This is not entirely a new question. In will contests the law is well settled that lay witnesses can testify to the mental condition or competency of a testator, short of insanity. (*Estate of Brooks,* 54 Cal. 471; *Hughes* v. *Grandy,* 78 Cal.App.2d 555 [177 P.2d 939]; *Dunphy* v. *Dunphy,* 161 Cal. 380 [119 P. 512, Ann.Cas. 1913B 1230, 38 L.R.A.N.S. 818].)

It is, of course, well settled that qualified lay witnesses can give an opinion as to the sanity of the accused. (See Code Civ. Proc., § 1870, subd. 4.) The Wells case established that opinion evidence by experts of mental condition affecting the formation of a specific intent was admissible on the ''not guilty'' trial. If lay witnesses can give an opinion as to sanity, there is no logical reason why qualified lay witnesses cannot give an opinion as to mental condition less than sanity. While the Wells case happened to involve the testimony of experts, the broad language of the court, some of which has been quoted, indicates that the court intended to lay down a broad rule that all relevant evidence of mental condition affecting the formation of a specific intent, is admissible on the trial of the ''not guilty'' plea. For these reasons it was error to exclude the proffered testimony.

Was the error prejudicial under article VI, section

4½, of the Constitution? We think not. It must be remembered that the lay witnesses were all permitted to testify as to the objective facts relating to appellant's condition—that is, that he was tense, had lost weight, etc. Dr. Kelley was permitted to testify as to appellant's state of mind. Thus, all of the objective facts offered by appellant and the opinion of Dr. Kelley based on those facts were before the jury.

Moreover, the evidence as a whole is such that the error could not have been prejudicial. Appellant at the time of his arrest on December 25, 1954, and again on December 27, 1954, gave the police detailed statements about the circumstances of the killing. In those statements he made no mention about the deceased reaching toward the pillow. As a matter of fact, appellant, in one of his statements, conceded that, prior to the shooting, the deceased had not attempted to attack him. At the trial he did contend that he was placed in fear by reason of the deceased reaching toward the pillow. But there is no substantial evidence of a real but unjustified fear such as was involved in the Wells case, or any evidence that appellant was unconscious of what he was doing as in the Gibson and Letourneau cases, *supra*. Yet, in even those cases the error in excluding such evidence was held not to be prejudicial. In our case evidence of malice aforethought and premeditation is strong. Under such circumstances, we cannot say that "a different verdict would not have been improbable had the error not occurred." (*People* v. *Teixeira*, 136 Cal. App.2d 136, 151 [288 P.2d 535].)

Appellant next objects to the following instruction which was given by the trial court: "The intent or intention with which an act is done is manifested by the circumstances connected with the offense and the sound mind and discretion of the person committing the act. As you have been previously instructed, all persons are of sound mind who are neither idiots, nor lunatics, nor affected with insanity. Upon the trial of the issue raised by the plea of not guilty, the defendant is conclusively presumed to have been sane at the time the offense is alleged to have been committed."

Appellant argues that the first sentence of the instruction should not be given in a case where the double plea is interposed, because, since the defendant is conclusively presumed sane, the instruction tells the jury to find criminal intent from no evidence at all, and that the jury may infer such intent from the conclusive presumption of sanity. ██ Thus, so it is claimed, this instruction reverses the burden of proof

as to criminal intent. This is a strained unnatural construction of the instruction. The instruction simply told the jury that intent is "manifested by the circumstances connected with the offense," but that as to insanity affecting this question it must be ruled out. Obviously, this does not prevent the jury from considering factors other than insanity which bear upon the issue of specific intent, such as fear, passion, tension, etc. Moreover, the trial court properly instructed that all elements of the crime had to be proved by the prosecution; that if the jury found that the act was committed, then they must determine whether it was committed with criminal intent; that each element of the crime had to be proved beyond a reasonable doubt. The court properly defined "deliberation" and "premeditation," and instructed that a person intends the ordinary consequences of his voluntary acts, and that if the defendant used a deadly weapon so as to imperil life without provocation, such fact would support an inference of felonious intent, which inference, however, must be weighed against contradictory evidence.

Thus, the instructions did not, as appellant claims, reverse the burden of proof on the issue of criminal intent. The jury was simply told that they must find such intent beyond a reasonable doubt, but that such intent was manifested by the circumstances connected with the offense, together with the sound mind and discretion of the appellant. While the jury was properly told that they must conclusively presume appellant to be sane, they could, on the "not guilty" trial, consider other factors affecting the question of specific intent.

Appellant objects to the refusal of the trial court to give a proffered cautionary instruction regarding the testimony of young children. The trial judge refused the instruction on the ground that such cautionary instructions should be given only in sex cases and should not be given in other cases because it "singles out a single group of witnesses for an emphasized consideration thereby suggesting that special tests of credibility be applied [to] them alone. The general tests of credibility in weighing evidence have been stated. . . . It is sufficient and adequate to embrace every witness in this case." This was sound reasoning. In *People* v. *Putnam,* 20 Cal.2d 885 [129 P.2d 367], the court reviewed at length the cases requiring a cautionary instruction in sex cases and concluded (p. 890): "There is no general rule that the testimony of children admittedly competent as witnesses is less trustworthy than the testimony of older persons; hence there is ordinar-

ily no occasion for a cautionary instruction on that basis.'' While this statement is dicta in that case, it is sound dicta, and should be followed.

Objection is made to the following instruction on manslaughter given by the trial court: ''Neither the passion of fear, of itself, nor the passion for revenge, of itself, nor the passion induced by and accompanying or following an intent to commit a felony, of itself, nor any or all of these passions, in and of themselves, constitute the heat of passion referred to in the law of manslaughter which I have stated to you. Any or all of such specific emotions may be involved in a heat of passion that dethrones judgment and substitutes impulse and rashness, but also any one or more of them may exist in the mind of a person who acts deliberately and from choice following his own reasoning howsoever good or bad it may be. Hence the law sets up the standard and requires the test [that the exciting cause must be such as to arouse the mind of an ordinarily reasonable person] for determining whether or not the defendant acted under heat of passion.''

██ It was proper to tell the jury that fear alone and by itself is not sufficient to reduce murder to manslaughter. The exciting cause, whether it be fear or other incitement, must be such as would naturally tend to arouse the passion of an ordinarily reasonable man. (*People* v. *Valentine,* 28 Cal.2d 121 [169 P.2d 1]; *People* v. *Logan,* 175 Cal. 45 [164 P. 1121].)

██ It is next urged that one of the instructions given on premeditation was in error. This instruction told the jury: ''The law does not require as an essential element of first-degree murder that any prescribed or standardized amount of time elapse between the formation of the intent to kill and the act of killing or be used in the deliberation. It is only necessary that the act of killing be preceded by, and be the result of a concurrence of will, deliberation and premeditation on the part of the slayer to constitute murder in the first degree, regardless of how rapidly or slowly these mental processes succeed each other or how quickly or tardily they are followed by the act of killing.''

It is the contention of appellant that this instruction is similar to the one held erroneous in *People* v. *Carmen,* 36 Cal.2d 768, 777 [228 P.2d 281]: ''There need be, however, no considerable space of time devoted to deliberation.'' The Supreme Court criticized the use of the term ''considerable,'' because of its uncertain meaning. In the instant case the

416

court avoided the use of the criticized word by using the phrase "any prescribed or standardized amount." Moreover, the court not only properly defined "premeditation" and "deliberation," but also instructed that: "The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. The true test is not the duration of time, but rather the extent of the reflection." (See generally *People* v. *Daugherty,* 40 Cal.2d 876 [256 P.2d 911].) There was no error in the challenged instruction.

■ Appellant also objects to the fact that the court read the dictionary definition of "coyote," which is "a small species of wolf . . . common to the plains, it can run swiftly and is very cunning, but lacks the ferocity of the large timber wolves." The court instructed that the jury "could weigh and consider this authoritative definition together with any other testimony before you as to its meaning giving to the latter such effect and credit as you may deem it entitled to under the general instructions of the court relating to the credibility of witnesses."

It is urged that this was error in that appellant had testified that in Texas the word was used as an insult, that local usage controls, and the dictionary definition weakened the insult as a provocation. In this connection appellant relies on the rules applicable to the construction of documents. (Code Civ. Proc., § 1861.) The trial court properly instructed that in considering the weight to be given to the term as provocation the jury could consider all the meanings of the term "coyote" and should not be compelled to accept appellant's testimony as to his understanding of the term as used in Texas. There was no testimony as to the deceased's understanding of the term.

■ It was not error to instruct that the prosecution was by the People and not by any witness and that any offense involved, if one was committed, "is committed against the public and not against the individual." It is argued that such instruction implies that the conduct of the deceased is not to be considered in determining the culpability of the accused. The appellant misconstrues the meaning of the instruction. Certainly, it does not state or imply that the conduct of the deceased was not to be considered in fixing appellant's culpability. The conduct of the deceased and its effect on appellant

were fully covered in other specific instructions. The instruction challenged contains a correct statement of the law. (*People* v. *Martin,* 102 Cal. 558 [36 P. 952].)

Appellant makes a determined attack on the admission of his various confessions and exclusion of certain evidence offered by him in connection with them. On the "not guilty" trial the confessions were offered by the prosecution. Appellant was permitted to examine the chief of police on *voir dire* as to whether the proffered confessions were freely and voluntarily given, and permitted to question the chief as to appellant's mental condition at the time of the confessions. The trial court then admitted the confessions into evidence. Later the trial court refused to permit certain lay witnesses, who were not present when the confessions were taken, to testify that in their opinion the appellant was insane at the time of the confessions.

There is no doubt that the *voir dire* examination was such as to permit the confessions to be admitted. ██ The real question is whether or not, on the issue of credibility of the confessions, the appellant should have been permitted to show by the lay witnesses that his mind was affected, or that he was insane when he made the confessions. The rejection of the offer of proof on this issue was error. (*People* v. *Boyington,* 3 Cal.App.2d 655 [39 P.2d 867] ; *People* v. *Gomez,* 41 Cal.2d 150 [258 P.2d 825].) But this error, considered alone or with the other errors committed, could not have been prejudicial. As already pointed out, appellant's mental condition was gone into in great detail. The lay witnesses were permitted to testify, at length, as to their observations of the appellant and of the objective conditions that they observed. Two psychiatrists were permitted to give their opinions on the subject. Thus, insofar as the proffered evidence would have shown a mental state less than insanity, there could have been no prejudice.

██ Appellant attempted to have a transcribed copy of a three-hour recording of his statements to the police introduced in its entirety. Appellant contends that the entire statements were part of a continuous narration, and therefore fall within the rule that when "part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other . . . and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writ-

ing, which is necessary to make it understood, may also be given in evidence." (Code Civ. Proc., § 1854; see also *People* v. *Stevenson*, 103 Cal.App. 82 [284 P. 487].) But there are, of course, limitations on the rule. In the instant case appellant's counsel was furnished with a complete transcription of the confessions. Obviously, much of the three-hour transcription was irrelevant and inadmissible. Under such circumstances it was the duty of appellant, who had a copy of the transcript, to separate the relevant from the irrelevant, and to make his offer of proof accordingly. This he did not do. It was not error therefore to refuse to permit the entire transcript to be introduced. (See *People* v. *Tarantino*, 45 Cal. 2d 590 [290 P.2d 505].)

The appellant makes several charges of misconduct against the district attorney. One such charge involves the testimony of Frankie, one of the children of appellant. On direct examination, as a witness for appellant, Frankie corroborated his father's testimony that appellant had been threatened with violence by various members of the family. On cross-examination the prosecutor asked the witness whether appellant had ever shot at Frankie. Frankie replied "yes," and in response to a question from the district attorney, started to go into the details. The court, of its own motion, without objection from appellant, stopped the answer, stating that appellant was on trial only for murder and not for shooting at anybody else. Then, after appellant had taken the stand and testified on direct, on cross-examination the prosecutor asked him if he had ever shot at Frankie. The appellant replied that he had shot, but not at Frankie. The appellant assigned the question as misconduct. The court struck the answer, and the district attorney acquiesced in the ruling and apologized to the court. The court refused a mistrial, stating that the question had been asked innocently.

In view of the trial court's holding that the prosecutor did not attempt to reopen the subject in bad faith, and that appellant made no objection when the subject was first opened, so that the subject matter was already in the record, it is obvious that the trial court did not err in refusing to cite the prosecutor for misconduct. Under the circumstances, the error, if any, was cured by the motion to strike. (*Shaff* v. *Baldwin*, 107 Cal.App.2d 81 [236 P.2d 634]; *Jonte* v. *Key System*, 89 Cal.App.2d 654 [201 P.2d 562].)

The next contention of appellant is that one of the jurors was guilty of misconduct of such a nature that a new trial

should have been granted. One Bradley was elected foreman of the jury. After the "not guilty" trial had been completed, but while the "insanity" trial was in progress, an investigator for appellant heard Bradley discussing the case with various people at a public bar. This was reported to the trial judge. He reprimanded Bradley for disobedience of the court's admonition not to discuss the case, removed him from the jury, and replaced him with a qualified alternate. A mistrial was denied. On motion for a new trial appellant filed affidavits of several members of the jury averring that, during the "not guilty" trial, Bradley had shown them a magazine article purporting to show that holding a pistol in the manner the evidence showed appellant had held it was the most accurate way to shoot such a weapon, and also averring that the deceased was known to him to be a fine man and advocating that the death penalty be imposed on appellant. Bradley was also shown to be a friend of one Jehls, and from this, appellant desires us to take judicial notice of the relationship between Jehls and the then district attorney, and tries to raise an inference that there was some unsavory connection between Bradley and the district attorney. This last inference is predicated on the wildest type of speculation and is clearly without merit.

So far as the refusal of the trial court to grant a new trial based upon the juror's affidavits in reference to the conduct of Bradley is concerned, the trial court's refusal to grant the new trial on this ground was clearly correct. The general rule, here applicable, is that a juror's affidavit is not admissible to impeach his verdict except where the verdict was arrived at by lot. (Pen. Code, § 1181, subd. 4; Code Civ. Proc., § 657, subd. 2; *People* v. *Sutic*, 41 Cal.2d 483 [261 P.2d 241].) It is true that in *Shipley* v. *Permanente Hospital*, 127 Cal.App.2d 417 [274 P.2d 53], it was held, in a case *affirming* an order granting a new trial, that a juror's affidavit could be used to impeach the verdict where a juror could have been challenged for cause on *voir dire* but avoided such challenge by testifying falsely as to his state of mind. In such a case the disqualification had its origin before the jury was impanelled. It is urged that this exception is here applicable because, so it is argued, Bradley on his *voir dire* must have misrepresented his state of mind as to his willingness to follow the court's instructions. This is a far-fetched and certainly not inevitable inference. The trial court by its ruling denying the motion for a new trial neces-

sarily impliedly found that Bradley did not misrepresent his state of mind on the *voir dire* examination. This finding cannot be reversed in the absence of a showing of a clear abuse of discretion. No such showing was here made. (*People* v. *McCaffrey*, 118 Cal.App.2d 611 [258 P.2d 557]; *Pollind* v. *Polich*, 78 Cal.App.2d 87 [177 P.2d 63].) For these reasons the affidavits fall within the general rule and were inadmissible.

 Several errors are urged in connection with the examination of Dr. Allegrini during the "insanity" trial. As already pointed out, on the issue of insanity, the evidence was sharply conflicting. Dr. Allegrini opined that the appellant was insane. During his examination the doctor was asked: "if you assume that the decedent in this case said to Webb just before the shots were fired that the blood of the baby, the parentage of which was in dispute, had tested coyote blood,—if you assume those facts, would that have any bearing,——" Here the court interrupted and stated that at this state of the trial the issue of provocation was not relevant, and struck the portion of the question referring to "coyote" blood. Later the trial court saw that this ruling was erroneous, and in its instructions so told the jury, and also told the jury that Dr. Allegrini was entitled to consider the portion of the question relating to "coyote blood," and told the jury that they should consider this assumption in connection with the overall opinion of the doctor that appellant was insane. Dr. Allegrini, however, was not recalled as a witness. It is urged that it was prejudicial error not to recall the doctor, and that the instruction alone did not cure the error.

Certainly, it would have been better practice to have recalled Dr. Allegrini. But, it is obvious that the error in failing to do so could not possibly have been prejudicial. Dr. Allegrini testified that in his opinion appellant was insane. The striking out of the portion of the question relating to "coyote blood" would only strengthen, not change, that opinion. Thus, when the trial court told the jury that they could consider this portion of the question in support of the opinion that appellant was insane, the error in originally excluding this basis of the opinion was cured.

 Also objected to are the rulings of the court prohibiting Dr. Allegrini from testifying that at the time of the killing appellant "blacked out." Dr. Allegrini testified that prior to the killing appellant for a long period harbored a deep depression; that he developed a definite psychosis; that at the time of the killing he reached a climax, everything went

black, he became an imbecile in that he did not know what he was doing. Over appellant's objection the court asked the doctor what facts supported the opinion that appellant had "blacked out." The doctor replied: ". . . this man was called a coyote, I believe, or his child had coyote blood; a person that is abnormal mentally will carry along and they will do rational things until something strikes them, and I think that this probably was a trigger form of action that just caused him to black out and he just went haywire." The court then told the doctor that it was not concerned with what any person would do, but with what this particular defendant did; that the jury had determined on the "not guilty" trial that he had killed the deceased; that on that trial every witness at the scene of the killing, including the defendant himself, had testified in utmost detail and with great accuracy of recollection about just what occurred, and that there was not one word of testimony that appellant was unconscious or had "blacked out." The court excluded, therefore, the opinion evidence that appellant had "blacked out." It is urged that this was misconduct in that the doctor should have been permitted to give his opinion that appellant had "blacked out" as a scientific conclusion from the facts in evidence, and that such misconduct was not cured by the later instruction that it was for the jury to determine whether there was any evidence that appellant had "blacked out," and if they found such, they could consider it along with the doctor's opinion as to sanity. Certainly it is not the law that an expert will be permitted to testify that an accused "blacked out" when all the evidence shows that the accused, even according to his own testimony, knew everything that was happening to him before, during and after the commission of the crime. (*People* v. *Gibson*, 92 Cal.App.2d 55 [206 P.2d 375].)

At the close of the "insanity" trial the court gave instructions on intent, and the presumptions relating to intent. It is urged that such instructions are not applicable to the "insanity" trial and served to confuse and mislead the jury. Probably such instructions should not have been given on an "insanity" trial where the only issue is whether the accused knew the difference between right and wrong, but it is quite obvious that even the erroneous giving of the instructions could not have been prejudicial.

Error is also charged in that the trial court instructed of its own accord that blood tests do not establish paternity, but

may establish that a particular man is not the father. This instruction did not improperly disparage the "coyote blood" conversation. The instruction was obviously intended as a general background instruction, and did not unduly reflect on any factual issue.

Appellant objects to an instruction to the effect that the law presumes all persons to be sane until the contrary is established by a preponderance of the evidence, and that the "doctrine of beyond a reasonable doubt" has no application to the burden of proof as to insanity. Whatever may be the rule in the federal courts (see *Durham* v. *United States*, 214 F.2d 862) as an intermediate court we are bound, with certain exceptions not here involved, by the decisions of the Supreme Court of California. ▮ That court, in *People* v. *Daugherty*, 40 Cal.2d 876 [256 P.2d 911], held that the burden of proof is on the defendant to prove insanity by the preponderance of the evidence. The challenged instruction was based on the rule of that case.

▮ But, says appellant, if the burden of proof as to insanity was on him, he should have been afforded the right to open and close the arguments to the jury on that trial. This is a matter resting solely within the discretion of the trial court. Refusal of such right is not error. (*People* v. *Letourneau*, 34 Cal.2d 478 [211 P.2d 865].)

The last major contention of appellant is that the evidence fails to support first degree murder, and that, if the case is not reversed, the crime should be reduced to second degree murder. It is argued that the 15 to 25 second interval that elapsed between the "coyote" conversation and the shooting is insufficient to show deliberation and premeditation because during that short interval there was provocation existing. It is apparently the contention of appellant that if provocation exists during the claimed period of deliberation the crime is automatically reduced to second degree murder. For this somewhat startling proposition appellant relies on *People* v. *Thomas*, 25 Cal.2d 880 [156 P.2d 7]. That case, which contains an excellent discussion of the differences between the various degrees of homicide, stands for no such formalistic doctrine. In that case the court, in discussing provocation, stated (p. 903): "Provocation of a kind, to a degree, and under circumstances insufficient to fully negative or raise a reasonable doubt as to the idea of *both* premeditation *and* malice (thereby reducing the offense to manslaughter) *might* nevertheless be adequate to negative or raise a reasonable

doubt as to the idea of premeditation or deliberation, leaving the homicide as murder of the second degree; i.e., an unlawful killing perpetrated with malice aforethought *but without premeditation and deliberation."* (Italics added with the exception of the words "both" and "and.")

The basic question in the instant case is whether the finding of premeditation and deliberation is supported. In considering that problem, the question of provocation is relevant but not decisive. It is a factor, but not a conclusive factor, that should be considered on the issue of premeditation. Such factor, along with the other evidence, should be weighed by the jury. But although provocation is shown, in a proper case, premeditation can also exist. That is this case. Certainly, tested by the standards set forth in the Thomas case, the evidence supports the finding of premeditation even though we assume that provocation also existed. In the Thomas case, *supra,* at page 900, the Supreme Court had the following to say about premeditation: "Neither the statute nor the court undertakes to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent which is truly deliberate and premeditated. The time would vary with different individuals and under differing circumstances. The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly, but the express requirement for a concurrence of deliberation and premeditation excludes from murder of the first degree those homicides (not specifically enumerated in the statute) which are the result of mere unconsidered or rash impulse hastily executed." (See also *People* v. *Carmen,* 36 Cal.2d 768 [228 P.2d 281].)

Appellant argues that the 15 to 25 second interval, with provocation existing, was not sufficient to show premeditation, and that the evidence, introduced by the prosecution, that appellant purchased a round-trip railroad ticket from and to Texas and immediately surrendered to the police after the killing, rebuts any inference of premeditation. Those facts are important, but by no means are conclusive, on the issue of premeditation. There is other evidence to support an implied finding of premeditation. In the first place, there is the statement made by appellant to one of his children, several months before the killing, that appellant intended to kill Steve if it was the last thing he did. Moreover, there is

ample evidence that appellant had an obsession against the deceased from the time of his marriage to Mrs. Webb. Moreover, the purchase of the gun, the bringing of it to California, the assembling of it just before getting off the train, and coming to California without luggage supports the inference that he left Texas with the calculated intent to murder the deceased. When this evidence is coupled with the circumstances of the killing, already set forth at length, the implied finding of premeditation is amply supported.

Some errors were committed during this rather lengthy trial—the reporter's transcript totals nearly 1,200 pages—but the number of errors are no more than are to be expected in a lengthy hotly fought case. These errors, considered singly and considered together, in our opinion were not prejudicial. For that reason the judgment and order appealed from are affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied August 10, 1956, and appellant's petition for a hearing by the Supreme Court was denied August 21, 1956.